## OTTO CANDIES, LLC

### v.

## UNITED STATES OF AMERICA

Nos. Civ.A. 99–3692, Civ.A. 99–3693, Civ.A. 01–450, Civ.A. 01–452.

United States District Court, E.D. Louisiana.

May 28, 2003.

As Amended June 12, 2003.

Jerome John Reso, Jr., John A. Rouchell, Leon Hirsch Rittenberg, III, Baldwin & Haspel, LLC, New Orleans, LA, Albert H. Turkus, Pamela F. Olson, Julia M. Kazaks, Troy L. Olsen, Skadden, Arps, Slate, Meagher & Flom, LLP, Washington, DC, for plaintiff.

John M. Bilheimer, Christopher M. Pietruszkiewicz, U. S. Department of Justice, Tax Division, Washington, DC, Hemant Sharma, Mark Stier, U. S. Department of Justice, Washington, DC, for defendant.

Richard Edgar Anderson, Harahan, LA, for movant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

AFRICK, District Judge.

In these consolidated cases,[1] plaintiffs, Otto Candies, L.L.C., successor to Otto Candies, Inc., jointly referred to as "OCI," and Candies Towing Company, L.L.C., successor to Candies Towing Company, Inc., and jointly referred to as "CTI," seek a refund of accumulated earnings taxes, as well as related penalties and interest, that were assessed against them by the Internal Revenue Service pursuant to 26 U.S.C. § 531. The assessments relate to fiscal years ending April 30, 1991, through April 30, 1996, with respect to OCI, and fiscal years ending April 30, 1991, through April 30, 1995, with respect to CTI.

On January 13, 2003, a non-jury trial commenced which concluded on January 17, 2003. Upon consideration of the evidence adduced at trial, including the testimony of the witnesses and the admitted exhibits, the briefs and arguments of counsel, and the law, the Court makes the following findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

### I.

Plaintiffs, OCI and CTI, are in the marine transportation business, predominantly serving the offshore oil and gas industry in the Gulf of Mexico.[2] OCI owns and

---

1. Civil action Nos. 99–3692, 01–450, 99–3693, and 01–452 were consolidated on March 2, 2000. R. Doc. No. 6.

2. R. Doc. No. 84, Testimony of Otto Candies, Jr., pp. 28–29.

Trial transcript, R. Doc. Nos. 84–87. All further references to the testimony of wit-

operates powered vessels such as offshore supply vessels ("OSVs") and tugboats ("tugs"), while CTI owns and operates non-powered vessels such as barges.[3] OCI and CTI are limited liability companies organized and existing under the laws of the State of Louisiana.[4] The companies' principal place of business is in Des Allemands, Louisiana.[5]

The parties dispute whether plaintiffs are due a refund of accumulated earnings taxes, associated penalties and interest paid, plus further interest thereon in accordance with the law. As will be discussed in more detail below, the Internal Revenue Code imposes accumulated earnings taxes on corporations deemed to have accumulated earnings and profits for the purpose of avoiding taxes that might otherwise be imposed if the income was distributed to shareholders. 26 I.R.C. §§ 531, 532(a).[6]

Plaintiffs' position is that accumulated earnings taxes, as well as associated penalties and interest, should not have been assessed against plaintiffs. Plaintiffs argue that to the extent the companies retained funds, they did so for business purposes and not to avoid taxes. Plaintiffs contend that at the end of each year in question, each company had reasonable

identified business needs that exceeded the companies' available assets for that year. According to the plaintiffs, their business needs included (1) replacing the companies' aging fleet; (2) investing in particular projects associated with the companies' core business, but not their day-to-day operations; (3) providing for the companies' working capital needs; and (4) being prepared, should such need arise, to redeem the stock of one of the companies' three major shareholders.[7]

### Procedural History

For purposes of this lawsuit, the "years in question" are fiscal years 1991 through 1996 for OCI and fiscal years 1991 through 1995 for CTI.[8] During the years in question, OCI and CTI were both corporations organized and existing under the laws of the State of Louisiana and they were taxed pursuant to Subchapter C of the Internal Revenue Code.[9] During these years, the companies timely filed their federal income tax returns and paid all taxes reportedly due.[10]

On January 12, 1995, and then again on October 23, 1998, the Internal Revenue Service ("IRS") issued notices of deficiency, stating that the companies owed additional amounts, including accumulated earnings taxes and related penalties and

---

nesses and to trial exhibits refer to R. Doc. Nos. 84–87.

**3.** Testimony of Otto Candies, Jr., pp. 28–30.

**4.** R. Doc. No. 88, Pretrial order, Uncontested facts, ¶ 7 i.

**5.** *Id.*

**6.** Citations to the Internal Revenue Code of 1986 as amended (26 U.S.C.) are noted as "I.R.C. § ."

**7.** R. Doc. No. 88, Pretrial order, Summary of material facts, ¶ 6.

**8.** The companies' fiscal years end on April 30 of each year. For example, "fiscal year

1991" means May 1, 1990, to April 30, 1991. Transcript, p. 29.

**9.** R. Doc. No. 88, Pretrial order, Uncontested facts, ¶ 7 i. OCI and CTI are presently limited liability companies and are taxed pursuant to Subchapter S of the Internal Revenue Code. However, during the years in question, they were both corporations organized and existing under the laws of the State of Louisiana and were taxed pursuant to Subchapter C of the Internal Revenue Code. *Id.* Sometime after 1996, OCI and CTI changed their corporate status from a Subchapter C to a Subchapter S company. Testimony of Otto Candies, Jr., pp. 136–37.

**10.** *Id.* at ¶ 7 iii.

interest for each of the years in question.[11] OCI and CTI paid the total amount of the assessed taxes and penalties plus interest.[12] Thereafter, the companies submitted timely claims for refunds, seeking the return of the taxes as well as related penalties and interest paid.[13] Following negotiations with the IRS Office of Appeals, all issues raised in the claims for refunds were resolved except the accumulated earnings tax issue.[14] The remaining amounts in dispute are as follows:

### OCI

| Fiscal Year | Tax | Penalty | Interest | Total |
|---|---|---|---|---|
| 1991 | $1,407,768 | $ 281,554 | $ 541,458 | $ 2,230,780 |
| 1992 | 1,164,870 | 232,974 | 287,303 | 1,685,147 |
| 1993 | 1,422,827 | 284,565 | 208,278 | 1,915,670 |
| 1994 | 1,359,988 | 271,998 | 779,892 | 2,411,878 |
| 1995 | 1,889,607 | 377,921 | 792,905 | 3,060,433 |
| 1996 | 676,912 | 135,383 | 192,073 | 1,004,368 |
| TOTAL | $7,921,972 | $1,584,395 | $2,801,909 | $12,308,276 |

### CTI

| Fiscal Year | Tax | Penalty | Interest | Total |
|---|---|---|---|---|
| 1991 | $ 581,485 | $ 116,297 | $ 223,842 | $ 921,624 |
| 1992 | 971,621 | 194,324 | 240,230 | 1,406,175 |
| 1993 | 871,738 | 174,347 | 127,640 | 1,173,725 |
| 1994 | 1,569,390 | 313,878 | 898,930 | 2,782,198 |
| 1995 | 1,054,632 | 210,926 | 442,528 | 1,708,086 |
| TOTAL | $5,048,866 | $1,009,772 | $1,933,170 | $7,991,808 [15] |

### History of the Companies

OCI and CTI are family-owned and family-operated businesses founded in 1942 by the late Captain Otto Candies when he agreed to transport Humble Oil personnel on a borrowed boat to and from a location on Bayou Des Allemands where Humble Oil intended to drill an oil rig. He was then hired by Humble Oil to keep the canal leading to that location free from vegetation. Having no money, Captain Candies borrowed $500 to buy a boat in order to provide those services. Thereafter, he was hired to provide additional services to Humble Oil (now ExxonMobil) in connection with the rig's operation. Over a period of time, the marine transportation services offered by Captain Candies expanded and his companies evolved to become one of the leading providers of marine transportation services in the Gulf of Mexico.[16] The companies' growth is attributed in large part to Captain Candies' conservative philosophy of investing earnings back into the companies so that he would have funds to expand the companies and the companies would not have to incur debt.[17]

11. *Id.* at ¶ 7.iv, .v. Originally, the total amount of the assessed taxes, penalties, and interest for OCI for fiscal years 1991–1996 was $13,634,249.71. With respect to CTI, the original total amount of the assessed taxes, penalties, and interest for fiscal years 1991–1995 was $8,009,701.85. *Id.* at ¶ 7.vii.

12. *Id.* at ¶ 7.vi.

13. *Id.* at ¶ 7.vii.

14. R. Doc. No. 88, Pretrial order, Uncontested facts, ¶ 7.ix.

15. *Id.*

16. Testimony of Paul Candies, pp. 193–95.

17. Testimony of Kevin Candies, pp. 386–87; Exhibit P–923, Depo. testimony of Sid Mizell, pp. 35–36.

During the years in question, stock in OCI and CTI was held primarily by Captain Candies' three sons: Otto Candies, Jr., chairman and chief operating officer of OCI and CTI, Paul Candies, president of OCI and CTI, and Kevin Candies, executive vice president of OCI and CTI.[18] Otto Candies, III, the son of Otto Candies, Jr., was the companies' secretary and treasurer.[19] Otto Jr., Paul, Kevin, and Otto III (collectively, the "Candies family" or "management") work together in the same small office building and virtually see each other each day. As such, many management decisions are made informally at work, rather than during formal board meetings.[20] During and prior to the years in question, the companies paid no dividends to their shareholders.[21]

Because OCI and CTI provide transportation services to oil and gas companies, primarily in the Gulf of Mexico, the companies' economic vitality is largely dependent upon that industry. As the price of oil and gas rises and falls and exploration and production activities in the Gulf of Mexico correspondingly increase and decrease the demand for marine transportation services dramatically fluctuates.[22] In particular, the "day rate," which is the customary unit of pricing for vessel services, swings widely up and down depending upon market conditions.[23] These swings can occur over very short periods of time and they can be unpredictable.[24] In sum, the companies operate in a highly volatile business environment.

Nevertheless, OCI and CTI, despite the volatility of the oil and gas industry, have succeeded. Unlike many of their competitors, the companies funded their operations internally whenever possible, a strategy that, as previously stated, had its origin in the conservative business philosophy of the late Captain Otto Candies.[25] As a result, the companies, in part because they were debt free, have been able to successfully weather rough periods in the oil and gas industry.[26]

OCI and CTI have always had a good reputation in their industry. As Captain Robert J. Underhill,[27] defendant's expert in the Gulf of Mexico marine industry, himself acknowledged, "[T]hey were very frugal, a well-run company, closely held,

---

**18.** R. Doc. No. 88, Pretrial order, Uncontested facts, ¶ 7.x; Testimony of Otto Candies, Jr., p. 27; Testimony of Paul Candies, p. 191; Testimony of Kevin Candies, p. 384.

**19.** Testimony of Otto Candies, III, pp. 398–99. The Candies brothers and Otto, III continue to hold these positions.

**20.** Testimony of Otto Candies, Jr., pp. 39–40; Testimony of Paul Candies, p. 200; Testimony of Kevin Candies, p. 386; Testimony of Otto Candies, III, pp. 399–400.

**21.** Testimony of Otto Candies, Jr., pp. 40, 135.

**22.** Testimony of Otto Candies, Jr., pp. 29–30; Exhibit P–899, Blaydon report, pp. 13, 18–21, 27–30, 31–34; Testimony of Michael C. Odom, p. 571.

**23.** Testimony of Otto Candies, Jr., pp. 34–38; Testimony of Paul Candies, p. 197; Testimony of Underhill, p. 644; Exhibit P–899, Blaydon report, pp. 11–14, 18–21, 29–30, 32–34; P–903 (day rate table); Exhibit P–898, Odom report, pp. 23–25, 28, 61–63.

**24.** *Id.*

**25.** Testimony of Otto Candies, Jr., pp. 38–39; Testimony of Paul Candies. pp. 199–200.

**26.** Exhibit P–899, Blaydon report, pp. 24, 38–41.

**27.** Captain Underhill is a marine surveyor and a consultant. He holds an unlimited master license and has sixty (60) years of experience in the maritime industry in the Gulf of Mexico. As a marine surveyor and consultant, he has worked closely with numerous oil and gas companies in the Gulf of Mexico and he has served as an expert witness in various court proceedings. Exhibit D–76; Testimony of Underhill, pp. 626–632.

nothing but good.... They understood and knew the business ... in my estimation, better than anyone." [28] Likewise, Sid Mizell, senior vice president of sales and marketing for Halter Marine, Inc., a local shipyard, testified:

> The Candies have always been an organization that has over the years in my opinion ran their business very—I'm not sure if 'frugal' is a proper term, but they pay attention to their business, they don't get flamboyant with their lifestyles. They obviously reinvest in their fleet renewal programs, and as their equipment gets older, they continue to replace the older equipment with new equipment. And in my opinion, they have been one of the more successful operators.[29]

The years in question followed the roughest downturn in the history of the oil and gas industry.[30] After an oil price peak in 1981, the oil and gas industry suffered a severe recession that lasted at least until 1988.[31] During that recession, many of OCI's and CTI's competitors went bankrupt and/or were forced out of business.[32] OCI and CTI also suffered steep declines in revenue during that time, but their conservative approach of reinvesting earnings into the companies and avoiding debt by self-funding most operations enabled them to survive.[33] As defendant's expert, Captain Underhill stated, "[m]any companies went out of business, lost their shirts, but not the Candies. They were in pretty good shape. They were always—the old Candies, there was just—he wasn't a guy to spend money foolishly. They just didn't do it." [34]

In 1991 and the years that followed, the companies' management was acutely aware of the recession of the 1980s, and management proceeded with an extra measure of caution despite some increase in oil prices from 1988 to 1991. As Kevin Candies testified, "we were very, very cautious, wanting to move forward, but cautiously.... We had just experienced the depression of the '80s like none of us had ever seen before and it was a very scary thing...." [35] Throughout the difficult years in question, the companies and their peers were hopeful that the industry would rebound at any moment.[36] As such, the Candies wanted to remain in a position of financial strength so that when the market did rebound, the companies had the resources to expand and become more competitive.[37] However, in the early 1990s, oil prices declined again, further emphasizing the need for prudence.[38]

### Fleet Replacement

The companies' business centers around their respective fleets. During the years on question, the companies' fleet was growing old. After years of little capital

**28.** Testimony of Underhill, pp. 633, 638.

**29.** Exhibit P–923, Depo. testimony of Mizell, pp. 35–36.

**30.** Testimony of Otto Candies, Jr., p. 32; Testimony of Paul Candies, p. 197; Exhibit P–899, Blaydon report, pp. 18–19.

**31.** *Id.*

**32.** Testimony of Paul Candies, pp. 197–98; Exhibit P–923, Depo. testimony of Mizell, p. 38; Exhibit P–899, Blaydon report pp. 22–23.

**33.** Exhibit P–899, Blaydon report, pp. 24, 38–39

**34.** Testimony of Underhill, p. 634.

**35.** Testimony of Kevin Candies, pp. 385–86, 394.

**36.** Testimony of Otto Candies, Jr., p. 38; Testimony of Otto Candies, III, pp. 400–01;

**37.** *Id.*

**38.** Exhibit P–899, Blaydon report, p. 19; Exhibit P–898, Odom report, pp. 15, 17.

investment during the industry wide depression of the 1980s, many of the companies' vessels were beyond their optimum life expectancies.[39] In 1991, OCI's fleet included the following vessels:

| 16 OSVs: | 1 vessel | 23 years old |
| | 4 vessels | 19 years old |
| | 1 vessel | 17 years old |
| | 1 vessel | 16 years old |
| | 1 vessel | 13 years old |
| | 5 vessels | 12 years old |
| | 3 vessels | 8 years old |
| | | |
| 10 tugs: | 6 vessels | 10 years old |
| | 1 vessel | 9 years old |
| | 1 vessel | 6 years old |
| | 1 vessel | 5 years old |
| | 1 vessel | new [40] |

During times of expansion, OCI's practice was to replace its OSVs and tugs approximately every 12 years.[41] Even when the market did not support a 12 year replacement cycle, OSVs and tugs were generally not expected to be used for more than 15 years or, at the very latest, 20 years.[42] In the early 1990s, the average age of OSVs and tugs retired from the marine transportation service industry was 15 years.[43] As the above chart demonstrates, as of 1991 almost all of OCI's OSVs were nearly due or past due for replacement and some of the tugs were approaching the same status.

With respect to CTI, its fleet in 1991 including the following vessels:

| 25 barges: | 3 vessels | 21 years old |
| | 6 vessels | 18 years old |
| | 2 vessels | 15 years old |
| | 1 vessel | 14 years old |
| | 2 vessels | 12 years old |
| | 2 vessels | 11 years old |
| | 7 vessels | 10 years old |
| | 2 vessels | 9 years old [44] |

The life expectancy of barges is approximately 20 years.[45] Therefore, approximately one third of CTI's barges were nearly due or past due for replacement in 1991.

In addition to the growing age of its fleet, management was keenly aware that changes in technology and customer demands dictated a need for new vessels. As oil exploration moved further offshore into the Gulf, new OSVs and tugs with deep water capability were required.[46] Regardless of their condition, the older vessels in OCI's fleet could not meet these requirements.[47]

Plaintiffs' fleet replacement need was undisputed at trial. In fact, even defendant's own expert in the marine industry, Captain Underhill, emphatically agreed that the Candies needed to modernize their fleet in order to stay in business.[48]

---

**39.** Testimony of Otto Candies, Jr., p. 54; Exhibit P–899, Blaydon report, p. 48.

**40.** Testimony of Otto Candies, Jr., p. 31; Exhibit P–899, Blaydon report, Appendix D. revised, p. D–10.

**41.** Testimony of Blaydon, p. 679; Exhibit P–899, Blaydon report, pp. 54–55.

**42.** *Id.*

**43.** *Id.;* Exhibit P–86 (January/February 1990 *Ocean Industry* article).

**44.** Testimony of Paul Candies, p. 196; Exhibit P–899, Blaydon report, Appendix D revised, p. D–15.

**45.** Testimony of Blaydon, p. 679; Exhibit P–899, Blaydon report, p. 55.

**46.** Testimony of Otto Candies, Jr., pp. 44–49; Testimony of Paul Candies, pp. 202–03; Exhibit P–923, Depo. testimony of Mizell, pp, 57–58; Testimony of Frank Terrell, Jr., pp. 486–87; Exhibit P–899, Blaydon report, pp. 43–44.

**47.** Exhibit P–899, Blaydon report, pp. 48–49.

**48.** Testimony of Underhill, pp. 643–44.

Given the aged and outdated state of the existing fleet, it was management's intent to make substantial new vessel expenditures as soon as the market provided a reasonable return on its investment.[49] Each year, management expected and hoped that the following year would bring conditions ripe for fleet replacement. After the downturn of the 1980s, the companies' management was reluctant to make major vessel expenditures until it seemed clear that the prevailing day rates would justify the investment, particularly since new vessel technologies made boat building more expensive. Management's reluctance was shared by many of the companies' competitors. In fact, during the years in question, new vessel construction decreased significantly with respect to offshore operations conducting business in the Gulf of Mexico.[50]

According to the testimony of Candies family members, the companies' management discussed fleet replacement needs regularly during the years in question, both formally at board meetings reflected in several of the companies' minutes [51] and informally during day-to-day interactions with each other.[52] OCI intended to build 12 OSVs, ranging in size from 180 feet to 220 feet at a cost of between $3,500,000 and $5,000,000 each, and 6 tugs, approximately 9,000 horsepower each at a cost of approximately $3,000,000 each.[53] CTI in-tended to replace at least twelve of its barges at a cost of approximately $3,000,000 each.[54] The details concerning OCI's plans were recorded in interview notes written by IRS Agent Cyrus Fanguy in December, 1992, during the very beginning of his audit, when he met with Paul Candies and discussed OCI's fleet replacement plans.[55]

The companies also discussed their fleet replacement needs with management personnel at a number of shipyards during the years in question. In particular, Otto Candies, Jr. spoke regularly, as often as two or three times per month, with representatives of Bender Shipyards and Halter Marine.[56] During his conversations with shipyard representatives, Otto Candies, Jr. would discuss details of new vessel construction such as the type of equipment the vessels would require, pricing, horsepower, etc.[57] These conversations were not idle chatter. As Frank Terrell, vice president of sales for Bender Shipyard, testified:

> Otto Candies told me that he would buy some boats, that I just needed to stick with them, that they were serious, and that when the time was right they would be a buyer. They had a fleet to replace and they were going to replace it. I took that to be a very serious statement, so that's what we did. We stuck there and kept talking, and eventually condi-

---

**49.** Testimony of Otto Candies, Jr., pp. 44, 56–57; Testimony of Paul Candies, pp. 210–11; Testimony of Frank Terrell, Jr., pp. 484–85.

**50.** Otto Candies, Jr., pp. 33–34; Exhibit P–923, Depo. testimony of Mizell, pp. 52–53, 61; Testimony of Terrell, pp. 484, 500–01; Testimony of Underhill, pp. 645–46.

**51.** R. Doc. No. 88, Pretrial order, Uncontested facts, ¶¶ 7.xxxvi, .xlvi, .xlix; R. Doc. No. 65, Stipulation, ¶ 153.

**52.** Testimony of Otto Candies, Jr., pp. 42–43, Testimony of Paul Candies, pp. 201, 213.

**53.** Testimony of Paul Candies, pp. 204–06; Testimony of Cyrus J. Fanguy, pp. 536–540.

**54.** Testimony of Otto Candies, Jr., pp. 42–43, 53–55; Testimony of Paul Candies, pp. 202–03, 209–211.

**55.** P–914 (Fanguy notes of interviews).

**56.** Testimony of Otto Candies, Jr., pp. 42–43; Exhibit P–923, Depo. testimony of Mizell, p. 49; Testimony of Terrell, pp. 480–482.

**57.** Testimony of Terrell, pp. 480–81.

tions changed to where it made it worth their while to build new vessels.[58]

Similarly, Halter Marine, Inc.'s Sid Mizell testified:

> The Candies, like I said, they have always said that they are in the business to stay and to keep their fleet so that they're competitive.... [A] lot of people ... go out and shop and kick the tires, but when they came to us with a project, I always took them seriously, that it—at least if we didn't get the job, someone would.[59]

Plaintiff's expert witness, Dr. Colin Blaydon, provided his expert opinion as to the amount of financial resources he would have recommended that plaintiffs have available to meet fleet replacement needs during the years in question. Dr. Blaydon is Dean Emeritus of the Amos Tuck School of Business at Dartmouth College and a director of the economics and finance consulting firm of LECG.[60] His involvement with LECG primarily has been in the fields of quantitative analysis, financial economics, and corporate governance.[61] He has served on the board of directors of 26 corporations, including nine closely held companies and four family-owned companies.[62] He is recognized as an expert in finance, managerial economics and, in particular, the assessment of the strategic options available to a company, the impact of alternative strategies for retention of resources upon a company's long-term prospects for survival, and the analysis of the reasonable needs of a company for financial resources.[63]

Dr. Blaydon had numerous meetings with plaintiffs' management and investigated the details of their fleet replacement plans.[64] Analyzing such information, including data about the age of vessels in plaintiffs' fleet and anticipated costs of vessel replacement, Dr. Blaydon concluded that he would have advised OCI and CTI to retain the following amounts for fleet replacement at the end of each of the years in question:

| | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 |
|-----|------|------|------|------|------|------|
| OCI | $39,800,000 | 42,900,000 | 48,400,000 | 49,000,000 | 57,400,000 | 37,200,000 |
| CTI | $11,900,000 | 12,200,000 | 12,600,000 | 15,100,000 | 16,500,000[65] | |

These figures represent amounts needed merely to maintain, not expand, the existing fleet capacity.[66] The year-by-year totals are less than the fleet replacement costs the companies' management actually planned ($60,000,000 to $78,000,000 for OCI and $36,000,000 for CTI).[67] These

58. Testimony of Terrell, p. 485.

59. Exhibit P–923, Depo. testimony of Mizell, p. 62.

60. Exhibit P–899, Blaydon report, pp. 1–2.

61. *Id.*

62. *Id.*

63. Testimony of Blaydon, p. 661.

64. Exhibit P–899, Blaydon report, pp. 4, 9; Testimony of Blaydon, pp. 665–67.

65. Testimony of Blaydon, pp. 678–88, Exhibit P–899, Blaydon report, pp. 48–57.

66. Exhibit P–899, Blaydon report, p. 49. In his analysis, Dr. Blaydon used an assumed life of 16 years for OSVs and tugs which figure was midway between the 12 year life that was OCI's objective and a longer estimate of an assumed life of 20 years. Dr. Blaydon also assumed the barges expected life to be 20 years. *Id.* at pp. 54–55. Dr. Blaydon's figures take into consideration the proceeds from the sale of the old vessels, except barges, which were expected to have little or no salvage value at the time of replacement. *Id.* at 52, 54.

67. As previously mentioned, according to the testimony of the Candies, management planned to build 12 OSVs at $3,500,000 to $5,000,000 each, 6 tugs at approximately

totals are also considerably less than the $100,000,000 that defendant's expert, Captain Underhill, testified would have been required for plaintiffs to replace their aging fleet.[68] It is plaintiffs' position that the amounts quantified by Dr. Blaydon are the minimum amounts the companies should have retained during the years in question for fleet replacement.[69]

OCI ultimately did make major fleet replacement expenditures. From 1991 through 2001, OCI spent or committed to spend a total of $173,697,000 on new vessels, including 14 OSVs and 7 tugs. After subtracting approximately $84,559,000 from the sale of old vessels and approximately $40,000,000 in financing commitments, OCI has made or has committed to make a net outlay of approximately $50,000,000 of its own resources on fleet replacement.[70]

CTI has only just begun construction because its business remains depressed. In 2002, CTI committed to purchase a $15,000,000 barge. Management still intends for CTI to engage in major fleet replacement as soon as market conditions so warrant.[71]

---

$3,000,000 each, and 12 barges at approximately $3,000,000 each. These figures total between $60,000,000 and $78,000,000 for OCI and $36,000,000 for CTI.

**68.** Testimony of Underhill, p. 643.

**69.** R. Doc. No. 77, Post-trial memorandum, p. 5.

**70.** Testimony of Otto Candies, Jr., pp. 49–52, 56; Testimony of Paul Candies 206–08; Testimony of Terrell, pp. 494–98; Exhibit J–176 (table of construction contracts); Exhibit J–177 (table of vessel sales).

**71.** Testimony of Otto Candies, Jr., 50–51, 143–44; Testimony of Paul Candies, pp. 288–91; Testimony of Terrell, pp. 487–88.

**72.** Testimony of Underhill, p. 643.

Defendant offered no direct evidence disputing OCT's and CTI's fleet replacement plans or activity. To the contrary, as stated above, defendant's own expert, Captain Underhill, agreed that the companies needed to retain approximately $100,000,000 to replace their fleet.[72] His only contention was that the companies should have invested in fleet replacement earlier in the 1990s.[73] Notwithstanding that assertion, however, Captain Underhill readily admitted that reasonable business minds could differ as to the appropriate time for fleet replacement. Specifically, Captain Underhill testified:

> THE COURT: Captain, in all your experience that you've had and notwithstanding the regard which you have, from your testimony, for some of the things that the Candies do and their reputation in the industry, is it reasonable for me to assume that knowledgeable persons in the field such as yourself, such as the Candies, could have different business judgments as far as when it was necessary to replace a fleet?
>
> THE WITNESS: Why, certainly. Certainly.[74]

**73.** Specifically, Captain Underhill testified:

> BY MR. TURKUS:
> Q. I want to make sure I understand you, Captain Underhill. Your view is they should have started replacing their fleets during the '91 to '96 years?
> A. Yes.
> Q. In the deposition you gave me an estimate of the amount that would have been required to rebuild their fleets in the 90's. Do you remember that, sir?
> A. Vaguely.
> Q. Is it correct that it's your opinion here today that the amount they would have required to replace their fleets would have been in the neighborhood of $100 million?
> A. Yes.
>
> *Id.* at p. 643.

**74.** Testimony of Underhill, p. 640.

### Project Needs

The companies are frequently presented with opportunities to engage in various projects that are related to their business, but that are outside of their day-to-day operations of vessel chartering and brokering. These projects include opportunities to bid on large jobs and submit proposals to purchase, refit, or construct vessels for unique undertakings. The projects also include opportunities to finance the operations of the companies' customers and suppliers. Certain of the projects provide the companies with a means of diversifying their business outside the gas and oil industry in order to ensure economic survival.[75]

During the years in question, the companies were presented with numerous opportunities to engage in a variety of such projects.[76] The flow of projects was continuous. Some projects required extensive consideration and development before coming to conclusion, while others were addressed more quickly.[77] The projects took a variety of forms.[78]

At trial, plaintiffs identified a number of projects for which they anticipated business needs during the years in question. The projects relied upon by plaintiffs were all viable and outstanding as of the end of one or more of the years in question[79] and, according to plaintiffs, gave rise to a reasonably anticipated business need susceptible of quantification.[80]

Plaintiffs' counsel retained Michael C. Odom, a certified public accountant formerly employed by Arthur Andersen LLP, to provide his expert opinion regarding the various projects considered by OCI and CTI during the taxable years at issue. Mr. Odom has served as the "engagement partner" for numerous publicly and privately held oil and gas and oilfield services companies and he has over 30 years of experience in conducting audits and due diligence investigations for clients and lenders engaged in the oil and gas industry.[81] Mr. Odom was asked to testify regarding management's level of consideration of identified projects and to determine the amount of funds that would have been required to develop those projects, outstanding as of the end of any of the years in question, to which management gave serious and extensive consideration.[82] Mr. Odom reviewed extensive documentary files regarding the projects and met several times with the companies' management to discuss the projects.[83]

**75.** Testimony of Otto Candies, Jr., pp. 58–59; Exhibit P–898, Odom report, pp. 86–96.

**76.** *Id.*

**77.** Testimony of Otto Candies, Jr., pp. 59–62; Exhibit P–898, Odom report, pp. 96–98.

**78.** *Id.* As will be discussed more fully below, some projects were bids made in response to public requests for proposals to make major capital investments in marine transportation equipment that would be put to a particular specialized use. Others were job estimates made in response to more targeted requests, such as when someone familiar with the companies' reputation and capabilities would ask if the companies could provide certain-long term services. Still others were opportunities to invest in or co-venture with customers or potential customers with the objective of se-

curing business from those firms. R. Doc. No. 77, Plaintiffs' Post-trial brief, pp. 6–7

**79.** As will be explained below, the relevant law requires that a Court consider a company's reasonably anticipated needs "as they exist on the basis of the facts at the close of the taxable year." Treas. Reg. § 1.537–1(b)(2).

**80.** R. Doc. No. 61, Plaintiffs' Pretrial memorandum, p. 11.

**81.** Exhibit P–898, Odom report, pp. 4–5.

**82.** *Id.* at pp. 2–4.

**83.** Testimony of Odom, pp. 579–81; Exhibit P–898, Odom report, pp. 2–4.

In conducting his analysis, Mr. Odom reviewed approximately one hundred potential projects [84] and considered (1) the amount of time and resources committed by management for development of the project; (2) whether documents and other available information indicated that management gave the project serious consideration; (3) management's own indications of the consideration given to the pursuit and development of the project; (4) the degree to which project specifications and management's responsibilities with respect to the project were established; and (5) the commitment of the companies' funds for the development of the project.[85] Based on such criteria, Mr. Odom concluded that seventeen of the approximately one hundred identified projects were the subject of serious and extensive consideration by the companies' management and were under consideration as of the end of a taxable year.[86] Mr. Odom's opinion was corroborated by the testimony of the companies' management and third-party witnesses. It is only these projects, as set forth below, and their associated quantified needs, upon which plaintiffs rely in asserting the companies' reasonable business needs.[87]

### Marine Spill Response Corporation

After the Exxon Valdez oil spill, Congress directed U.S. oil companies to adopt oil spill cleanup procedures to minimize the effects of future oil spills from oil tankers. The oil industry's response was to create the Marine Spill Response Corporation ("MSRC"), a private company funded by the oil industry.[88] In late 1990 and early 1991, the MRSC sought bids for the construction and charter of up to sixteen vessels to respond to marine spills. On April 29, 1991, OCI submitted a four-volume bid to MSRC. Pursuant to that bid, OCI proposed to supply nine newly constructed oil spill response vessels for charter to the MSRC. The vessels would be designed and constructed by Halter Marine at a cost of $11,600,000 to $12,100,000 each, for a total of approximately $105,000,000.[89] The bid provided that OCI and CTI would finance the vessels, build the vessels, and be repaid through charter hire.[90]

84. Testimony of Odom, p. 580.

85. Testimony of Odom, pp. 580–81.

86. Exhibit P–898, Odom report, Exhibit I.

87. R. Doc. No. 77, Post-trial memorandum, p. 8.

88. Testimony of Otto Candies, Jr., pp. 58–59; Testimony of Paul Candies, pp. 216–17; Exhibit P–923, Depo. testimony of John Costello, pp. 7–8, 10.

89. R. Doc. No. 88, Pretrial order, Uncontested facts, ¶ 7 .xc.f. Although plaintiffs' counsel projects the cost at $105,000,000, the Court calculates the cost at between $104,400,000 to $108,900,000. The outcome of this case is not affected by any difference in these figures.

90. R. Doc. No. 65, Stipulation, ¶ 1; Testimony of Otto Candies, Jr., pp. 63–64, 67–68; Testimony of Paul Candies, pp. 217–19, 225–26; Exhibit P–923, Depo. testimony of Costello, pp. 36, 42; P–160 (bid cover letter); P–161 (bid excerpts).

Although it was generally management's practice to allocate the cost of a project between OCI and CTI, depending upon whether the project involved a powered or non-powered vessel, the large nature of this project required that the companies exhaust the bulk of their jointly available resources before they borrowed funds. The anticipated investment for this project was, therefore, allocated proportionately between OCI and CTI based upon their respective available assets in the relevant years. More specifically, it was anticipated that OCI would make an investment of $75,600,000 and CTI would invest the remaining $29,400,000. Testimony of Otto Candies, Jr., pp. 63–65; Testimony of Paul Candies, pp. 218–22, 338; Testimony of Odom, pp. 590–91; Exhibit P–898, Odom report, Exhibit I, pp. 37, 39–41.

In connection with this project, the companies solicited and received blueprints and other design drawings relating to vessel construction which would be submitted as part of their bid to the MSRC. The companies performed considerable research with respect to this project.[91] According to Admiral John D. Costello, president of the MRSC, the MRSC considered the companies' proposal to be a serious bid and he believed that the companies had the financial resources to support their proposal.[92]

OCI's bid remained outstanding at the end of the companies' 1991 fiscal year.[93] However, in the summer of 1991, MSRC rejected OCI's bid, opting instead to have the vessels built at its own cost.[94]

### Freeport New Discovery Sulphur

The companies had a long-standing relationship with Freeport McMoRan ("Freeport"), a firm engaged in sulphur mining and other natural resources production. In March, 1991, Freeport contacted the Candies regarding the movement of sulphur from Port Sulphur, Louisiana, to Tampa, Florida.[95] By letter dated April 5, 1991, OCI presented Freeport three proposed options for moving sulphur from the designated locations: (1) converting the *Louisiana Brimstone,* a vessel owned by Freeport, at an estimated cost of $31,000,000; (2) building a large tug-barge unit at an estimated cost of $30,250,000; and (3) building two smaller tug-barge units at a cost of $41,000,000.[96] One of Freeport's objectives with respect to this project was to have the vessel operator, rather than Freeport, invest the capital necessary to convert the *Louisiana Brimstone* or build the new vessels required to move the sulphur.[97]

The testimony of the witnesses, together with the corporate minutes of OCI and CTI, indicate that management committed significant time and resources to work with Freeport in developing the vessel specifications and related cost estimates, in coordinating vessel design specifications with engineers, and in confirming vessel delivery dates with the vessel contractor.[98] As of the fiscal year ending April 30, 1991, management anticipated investing at least $30,250,000 in this project.[99] This amount represents the least expensive of the options set forth in the April 5, 1991, proposal to Freeport.[100]

91. R. Doc. No. 88, Pretrial order, Uncontested facts, ¶ 7.g; Testimony of Paul Candies, pp. 217–18, 225–26.

92. Exhibit P–923, Depo. testimony of Costello, pp. 21–22, 35, 42.

93. Testimony of Otto Candies, Jr., pp. 68–69.

94. Testimony of Otto Candies, Jr., pp. 68–69; Testimony of Paul Candies, pp. 219, 225; Exhibit P–923, Depo. testimony of Costello, pp. 43–44.

95. Testimony of Otto Candies, Jr., pp. 69–71, 74–75.

96. R. Doc. No. 88, Pretrial order, Uncontested facts, ¶ 7.xci.c.; Testimony of Otto Candies, Jr., pp. 70–72; Exhibit P–923, Depo. testimony of Foster Duncan, pp. 16–19; Exhibit P–898, Odom report, p. 90; Exhibit PFJ–188 (04/05/91 letter).

97. R.Doc. No. 88, Pretrial order, Uncontested facts, ¶ 7; Exhibit P–923, Depo. testimony of Duncan, pp. 20, 23, 25, 40–41.

98. Exhibit P–898, Odom report, p. 91; R. Doc. No. 65, Stipulation, ¶¶ 16–17; Testimony of Otto Candies, Jr., pp. 69–75; Exhibit PFJ–188 (04/05/91 letter to Freeport) and Exhibit PFJ–189 (04/08/91 letter to Trinity Marine).

99. The barge costs were estimated to be $20,250,000 and the tug costs were estimated to be $10,000,000. Exhibit P–898, Odom report, pp. 90–92 and attached Exhibit I, pp. 18–19.

100. Testimony of Otto Candies, Jr., pp. 69–75; Exhibit P–923, Depo. testimony of Duncan, pp. 16–26; Exhibit P–898, Odom report, pp. 90–92.

Given the large nature of this venture, the companies expected to co-venture this project, allocating to CTI the non-powered vessel costs which were not to exceed the amount of CTI's available assets. The remaining costs will be allocated to OCI.[101] As of April 30, 1991, CTI had approximately $15,400,000 of available assets and, therefore, it would not have had the necessary available assets to make the full $20,250,000 barge investment contemplated. OCI had approximately $41,100,000 of available assets as of the 1991 fiscal year end. Accordingly, the anticipated investment for this project allocated $15,400,000 to CTI and the remainder, i.e., $14,850,000, to OCI.[102]

Foster Duncan, senior vice-president for Freeport–McMoRan Business Enterprises, testified by deposition that Freeport viewed its discussions with the companies as serious and that he believed the companies were seriously interested in the project and had the funds necessary to invest in same.[103] Ultimately, however, Freeport awarded the project to one of the companies' competitors.[104]

### Hall–Houston

During the years in question, Hall–Houston was an independent oil and gas exploration and development company that operated in the Gulf of Mexico.[105] In late 1990, OCI began soliciting Hall–Houston for marine transportation work. At or around that same time, Hall–Houston was experiencing cash flow difficulties and it proposed that OCI purchase Hall–Houston preferred stock in exchange for its business.[106] On or about January, 1991, Gary Hall, chairman and CEO of Hall–Houston, met with Paul Candies to discuss the purchase of the stock.[107] By April 30, 1991, OCI had made a commitment to make a $5,000,000 investment in Hall–Houston in return for Hall–Houston agreeing to make OCI its sole provider of marine transportation services.[108] Consistent with that agreement, on August 5, 1991, OCI purchased 50,000 shares of Hall–Houston preferred stock for $5,000,000.[109]

In early 1995, Hall–Houston contacted management regarding a proposed issuance of Hall–Houston subordinated notes.[110] By April 30, 1995, OCI had again committed to invest an additional $4,000,000 in Hall–Houston subordinated notes.[111] Consistent with that commitment, OCI subscribed on May 11, 1995 and on May 24, 1995, respectively, to make two separate purchases of two $2,000,000 Hall–Houston subordinated notes.[112]

**101.** R. Doc. No. 88, Pretrial order, Uncontested facts, ¶ 7; Exhibit P–898, Odom report, pp. 90–91 and attached Exhibit I, p. 19.

**102.** Testimony of Otto Candies, Jr., pp. 73–74; Exhibit P–898, Odom report, pp. 90–92 and Exhibit I, pp. 18–19.

**103.** Exhibit P–923, Depo. testimony of Duncan, pp. 24, 32–33, 46–47.

**104.** Testimony of Otto Candies, Jr., pp. 74–75; Exhibit P–923, Depo. testimony of Duncan, p. 25.

**105.** Testimony of Paul Candies, p. 227.

**106.** Testimony of Paul Candies, pp. 228–29; Testimony of Hall, pp. 460–61; R. Doc. No. 88, Pretrial order, Uncontested facts, ¶ 7.xcii.a.

**107.** Testimony of Hall, pp. 460–61.

**108.** R. Doc. No. 88, Pretrial order, Uncontested facts, ¶ 7.xcii .f.; Testimony of Paul Candies, p. 229; Testimony of Hall, pp. 467–69; Exhibit P–898, Odom report, p. 88.

**109.** R. Doc. No. 88, Pretrial order, Uncontested facts, ¶ 7 .xcii.e.; R. Doc. No. 65, Stipulation, ¶ 21; Testimony of Hall, pp. 464–65.

**110.** R. Doc. No. 88, Pretrial order, Uncontested facts, ¶ 7 .xcii.h; R. Doc. No. 65, Stipulation, ¶ 22; Exhibit P–898, Odom report, p. 89.

**111.** Testimony of Hall, p. 470.

**112.** R. Doc. No. 88, Pretrial order, Uncontested facts, ¶ 7, .xcii.j; Testimony of Paul Candies, pp. 231–32; Testimony of Hall, pp. 467–

Finally, in April 1996, OCI committed to provide $4,950,000 in financing to Hall–Houston. As of April 30, 1996, OCI had advanced $1,093,703 of that amount.[113]

Paul Candies testified that OCI made these investments in Hall–Houston based upon management's judgment that it was important to make the investments to maintain OCI's business relationship with Hall–Houston.[114] Mr. Candies' testimony was corroborated by that of Gary Hall, chairman and CEO of Hall–Houston, who acknowledged that if OCI had not made the investments, OCI would have lost some of the Hall–Houston marine transportation business to a competitor who was prepared to make an investment in Hall–Houston.[115] Each of the 1991, 1995, and 1996 financings provided Hall–Houston with the funds needed to engage in new activity that ultimately generated more business for the companies.[116]

The companies' gross receipts from sales to Hall–Houston for the 1990 to 1997 fiscal years were as follows:

| | |
|---|---|
| 1990 | $ 37,859 |
| 1991 | 0 |
| 1992 | 2,542,872 |
| 1993 | 4,490,543 |
| 1994 | 1,474,666 |
| 1995 | 2,081,793 |
| 1996 | 2,023,225 |
| 1997 | 2,084,981 [117] |

OCI and CTI continue to provide marine transportation services to Hall–Houston' successor, Energy Partners Ltd.[118]

### Tug for Gardinier Sulphur Barge

Gardinier was a subsidiary of Cargill, Inc. In November, 1990, Gardinier/Cargill hired OCI to tow a sulphur barge from Tampa, Florida to Mexico.[119] Initially, OCI towed the sulphur barge with an existing tug which had to be modified to be compatible with the barge. In January, 1991, OCI's board of directors began discussing the possibility of building a new tug specifically dedicated to this charter. The board estimated that the new tug would cost between $4,500,000 to $5,500,000.[120] On February 6, 1991, OCI and Cargill amended their November 29, 1990, contract and agreed that OCI would build a new tug to tow the sulphur barge.[121] At a March 28, 1991, OCI board of directors meeting, Otto Candies, Jr. announced that OCI had contracted with Halter Marine, Inc. for the construction of a new tug. The board estimated that the tug would cost approximately $3,000,000 and that the new tug's linkage system, engines and deck machinery would cost an additional $1,000,000 to $2,000,000 over the contract price with Halter Marine, at a

70; Exhibit P–898, Odom report, p. 89; Exhibit P–186 (05/11/95 Subscription Agreement); Exhibit P–187 (05/24/95 Subscription Agreement).

113. R. Doc. No. 88, Pretrial order, Uncontested facts, ¶ 7 .xcii.l; Testimony of Paul Candies, pp. 233–34; Testimony of Hall, pp. 471–75; Exhibit P–898, Odom report, pp. 88–90; Exhibit P–191 (04/26/96 Purchase Agreement letter); Exhibit P–192 (05/16/96 Subscription Agreement); P–193 (05/21/96) (Letter from Hall–Houston).

114. Testimony of Paul Candies, pp. 229, 233–35, 331.

115. Testimony of Hall, pp. 470–71, 475–73.

116. *Id.*

117. R. Doc. No. 88, Pretrial order, Uncontested facts, ¶ 7.xcii.g.

118. Testimony of Hall, pp. 465–67.

119. Testimony of Otto Candies, Jr., pp. 75–76; Exhibit PFJ–201 (11/29/90 Agreement).

120. R. Doc. No. 88, Pretrial order, Uncontested facts, ¶ 7 .xciii.c; Exhibit DFJ–87 (01/16/91 OCI minutes).

121. Testimony of Otto Candies, Jr. pp. 76–77; Exhibit PFJ–202 (02/06/91 Amendment to Agreement).

total projected cost of approximately $5,000,000.[122]

In fiscal year 1993, Halter Marine delivered the new tug, the *Kelly Candies*. The capitalized cost of the vessel was $3,600,000. The difference between that amount and the originally projected $5,000,000 cost was due to the fact that used equipment, rather than new equipment, was utilized. However, according to the testimony of Otto Candies, Jr., as of April 30, 1991, neither management nor Halter Marine expected the use of used equipment.[123] Therefore, as of the end of fiscal year 1991, management reasonably estimated that the projected expense for the construction of the *Kelly Candies* tug body, engines, linkage system and deck machinery would be approximately $5,000,000.[124]

*Offshore Pipelines, International Tugs*

In April, 1991, OCI was considering purchasing two tugs from Offshore Pipelines, International ("OPI") which had been previously owned by OCI.[125] The minutes of the April 19, 1991, board of directors meeting indicate that OCI was willing to trade services and forgive accounts receivable in exchange for the tugs.[126] Paul Candies

explained that by selling the two vessels, OPI "wanted to free up capital to do other things and have someone else do their marine transportation work."[127] OCI management concluded that purchasing the vessels would provide OCI with a valuable opportunity to work with OPI in West Africa.[128] Accordingly, as of the end of the 1991 fiscal year, management anticipated purchasing the vessels for up to $1,500,000 each.[129]

On October 5, 1991, OPI sent OCI a draft purchase agreement for the two tugs stating a total purchase price of $3,800,000.[130] OPI's offer was more than OCI was willing to pay for the tugs and, consequently, OCI decided against purchasing the vessels. Another buyer ultimately purchased them for $3,800,000.[131]

*Freeport Sulphur Tankers*

In April 1992, Sonny Launey of Freeport contacted Otto Candies, Jr. to inquire about the companies' interest in a ten-year contract to move sulphur from a new discovery site to Port Sulphur, Louisiana.[132] The companies' minutes from their April 20, 1992, board of directors meetings, as well as management's notes regarding the project, indicate that it was estimated that this venture would require a $10,000,000 investment.[133] In order to satisfy its obli-

**122.** R. Doc. No. 88, Pretrial order, Uncontested facts, ¶ 7 .xciii.f; Testimony of Otto Candies, Jr., pp. 77–79.

**123.** Testimony of Otto Candies, Jr., pp. 78–80.

**124.** *Id.* at pp. 80–81.

**125.** R. Doc. No. 88, Pretrial order, Uncontested facts, ¶ 7 .xciv.a. Prior to this project, OCI had sold OPI two of its older vessels. OPI spent a considerable amount of money refurbishing them for use in the Gulf of Mexico. Testimony of Paul Candies, p. 236.

**126.** R. Doc. No. 88, Pretrial order, Uncontested facts, ¶ 7 .xciv.a; Exhibit DFJ–89 (04/19/91 OCI minutes); Testimony of Paul Candies, pp. 237–38.

**127.** Testimony of Paul Candies, p. 237.

**128.** Testimony of Paul Candies, p. 237.

**129.** Testimony of Paul Candies, pp. 238–239.

**130.** R. Doc. No. 65, Stipulation, ¶ 30.

**131.** R. Doc. No. 65, Stipulation, ¶ 30; Testimony of Paul Candies, pp. 238–39.

**132.** R. Doc. No. 88, Pretrial order, Uncontested facts, ¶ 7 .xcv .a; Testimony of Otto Candies, Jr., pp. 81–82; Testimony of Otto Candies, III, p. 406; Exhibit P–923, Depo. testimony of Duncan, pp. 43–44 and Depo. Exhibits 6 OCP–0704 and 7 CTP–1246.

**133.** R. Doc. No. 88, Pretrial order, Uncontested facts, ¶ 7 .xcv.a; R. Doc. No. 65, Stipulation, ¶ 158; Testimony of Otto Candies, pp. 82–84; Testimony of Otto Candies, III, p. 406;

gations under the contract, management planned to use existing tugs and build two new barges. The Candies met with representatives of Freeport on numerous occasions to discuss the details of the project.[134] According to the testimony of both the Candies and Foster Duncan, senior vice-president of Freeport, Freeport viewed its discussions with the companies as serious and told the companies that they were a strong candidate for the project.[135] As of April 30, 1992, management was committed to going forward with the project if the companies were awarded the project.[136] However, ultimately, Freeport decided not to pursue the project with OCI, opting instead to build two of its own barges for this project.[137]

### Lykes Brothers Steamship Company Joint Venture

In early 1990, Lykes Brothers Steamship Company ("Lykes Brothers"), a company that owned and operated cargo ships, was considering converting some of its cargo ships into barges in order to render them more profitable. Beginning in early October, 1991, Lykes Brothers began discussions with OCI about a joint venture under which OCI would provide new or converted tugs to transport these barges.[138] The joint venture that was envisioned by OCI management, after considerable research on the available options, involved the construction of tugboats using integrated tug-barge systems with special linkage rather than conventional towing systems.[139] The cost of these vessels was estimated to be approximately $5,000,000 each.[140]

By the end of fiscal year 1992, OCI's management expected that at least two vessels would be constructed and that a minimum investment of $10,000,000 was anticipated.[141] Through its discussions with Lykes, management further believed, as of the end of fiscal year 1992, that OCI had a good chance of doing the project with Lykes.[142] Ultimately, however, Lykes did convert two of its vessels into barges but the joint venture between OCI and Lykes was not established.[143]

### American Gulf Shipping

Beginning in the late 1980s, the companies began pursuing a business relationship with American Gulf Shipping, Inc. ("AGS"). AGS owned and operated several vessels that transported grain, commodities, and other bulk cargo.[144] The companies were interested in a relationship with AGS because they wanted to expand their

---

Exhibit P–200 (project notes); Exhibit P–201 (project notes); P–202 (project notes).

One of Freeport's objectives was to have the vessel operator, rather than Freeport, invest the capital necessary to build the vessels required to move the sulphur. Testimony of Otto Candies, III, p. 407; Exhibit P–923, Depo. testimony of Duncan, pp. 40–42.

**134.** Testimony of Otto Candies, III, pp. 407–08.

**135.** Testimony of Otto Candies, Jr., p. 157; Testimony of Otto Candies, III, p. 407; Exhibit P–923, Depo. testimony of Duncan, pp. 41–42.

**136.** Testimony of Otto Candies, Jr., p. 86.

**137.** Testimony of Otto Candies, Jr., p. 85.

**138.** R. Doc. No. 65, Stipulation, ¶¶ 33, 159; Exhibit DFJ–90 (10/29/91 OCI minutes).

**139.** Testimony of Otto Candies, Jr., pp. 87–88.

**140.** Testimony of Otto Candies, Jr., pp. 87–89, 154; Exhibit P–898, Odom report, Exhibit I, pp. 16–17.

**141.** *Id.*

**142.** Testimony of Paul Candies, pp. 242–43.

**143.** Testimony of Otto Candies, Jr., pp. 87–88.

**144.** R. Doc. No. 88, Pretrial order, Uncontested facts, ¶ 7 .xcvii.a; Testimony of Paul Candies, pp. 243–44.

bulk cargo transportation business in order to mitigate their dependence on the oil and gas industry.[145] Management was aware that AGS was approximately $5,000,000 in debt to other creditors. Therefore, in an effort to build a lasting business relationship with AGS, OCI's management agreed that AGS would not pay for towing services performed by OCI and that AGS would accrue a significant accounts payable balance to OCI.[146] As Paul Candies explained, "This way, they could take the revenues they were generating from the work we were doing at that time and pay off [their] debt."[147]

As of April 30, 1992, management was committed to providing AGS with accounts receivable funding up to $5,000,000 for the next fiscal year, while AGS used its revenues to pay off other pre-existing debts.[148] In March 1993, OCI had accrued receivables from AGS of over $5,000,000. OCI transferred that balance to CTI. On March 26, 1993, AGS issued a promissory note to CTI for $5,698,292 which was secured by first mortgages on six AGS vessels.[149]

The relationship between the companies and AGS continued through the 1993 tax year and OCI's business with AGS increased. Because the companies and AGS were involved in a continuing and growing business and because management believed that the grain business had tremendous potential, OCI again committed as of April 30, 1993, to extend accounts receivable financing for an additional $5,000,000 during the 1994 tax year.[150] As of April 30, 1994, OCI's AGS receivable balance was $5,087,121.[151] CTI's note receivable balance was $4,736,246. Eventually, OCI, CTI and AGS entered into a series of transactions which resulted in OCI foreclosing on AGS's vessels in order to receive payment on the companies' outstanding accounts receivable balances.[152]

### CSX

This was a joint project for CTI and OCI.[153] In the early 1990s, the rail transport company, CSX, in order to eliminate various inefficiencies associated with the land route alternatives, considered transporting rail cars via the Gulf of Mexico, from Mobile and/or New Orleans to a port in Vera Cruz, Mexico. The rail cars would be transferred using a combination of tugs and barges or self-contained vessels. Under either scenario, the barges or vessels would be specially designed to transport rail cars.[154] CSX, via its consultants, Leo Richardson, Sr., and his son, Leo Richardson, II, contacted the Candies about possible participation in this project.[155] CSX initially wanted OCI and CTI to provide towing or other operating services for the

---

**145.** Testimony of Paul Candies, p. 244.

**146.** *Id.* at p. 245.

**147.** *Id.*

**148.** R. Doc. No. 65, Stipulation, ¶ 39; Testimony of Paul Candies, p. 245; Exhibit P–898, Odom report, Exhibit I, p. 8.

**149.** Testimony of Paul Candies, p. 245; Exhibit J–221 (schedule of accounts receivable).

**150.** Testimony of Paul Candies, pp, 246–47; Exhibit P–898, Odom report, Exhibit I, p. 8.

**151.** R. Doc. No. 88, Pretrial order, Uncontested facts, ¶ 7 .xcvii.r; Exhibit P–898, Odom report, Exhibit I, p. 7.

**152.** Exhibit P–898, Odom report, Exhibit I, p. 8.

**153.** Exhibit P–898, Odom report, Exhibit I, p. 21.

**154.** Testimony of Otto Candies, Jr., pp. 58, 90–91; Testimony of Otto Candies, III, pp. 410–12; Exhibit P–923, Depo. testimony of Andrew J. Westhoff, former finance director of CSX Transportation, pp. 11–12, 19, 36.

**155.** Testimony of Otto Candies, Jr., p. 91.

barges or vessels, but OCI and CTI proposed participation in the project on an equity investment basis in that they would build, own, and operate all of the vessels involved. CSX became interested in the companies' proposal.[156]

The minutes from the OCI and CTI board of directors meetings, as well as the various correspondence exchanged between the parties, show that negotiations between management and CSX began around October, 1992, and lasted through February, 1995.[157] Proposals for the transportation of the rail cars ranged from the construction and chartering of one tug-barge vessel to the construction and chartering of as many as four or five tug-barge vessels.[158]

In connection with this project, the companies invested significant time and money in researching all aspects of the construction of the vessels, including obtaining specifications and design drawings, meeting with representatives of CSX both in the United States and Mexico, and contacting financial institutions to discuss the possibility of borrowing funds in excess of the companies available assets.[159] CSX took the companies' proposal to finance, build, and operate the vessels seriously and considered OCI and CTI to be good candidates for the project. As Andrew J. Westhoff, finance director of CSX assigned to the CSX project during the relevant time period, testified:

It truly was a very interesting project but throughout it all the Candies proposals were, in fact still some of the best proposals that we had available. The capacity, their speed seemed to be just what we were looking for.

\* \* \* \* \* \*

[M]y personal conclusion was that they were definitely a viable candidate, yes. They had the expertise we were looking for. They could stand behind these letters they were sending to us. They seemed to be a very reputable company.[160]

As of fiscal years ending April 30, 1993, and April 30, 1994, management expected the full project to involve five tug-barge units or other rail carrier units, each costing approximately $20,000,000.[161] Therefore, as of April 30, 1993, and April 30, 1994, management anticipated a total investment of $100,000,000 and it was fully committed to using as much of the companies' available assets as reasonably possible to make that investment.[162]

According to management, funding for the tug vessels would have been provided by OCI, while funding for the barges would have been provided by CTI. However, since such a project contemplated a very large capital investment, the companies would have exhausted the bulk of their jointly available resources and they would have then had to borrow funds.

---

156. R. Doc. No. 88, Pretrial order, Uncontested facts, ¶ 7, .xcviii.b and .xcviii.g; Testimony of Otto Candies, Jr., pp. 91–93; Exhibit P–923, Depo. testimony of Westhoff, pp. 85–87.

157. Testimony of Otto Candies, Jr., pp. 93–101; R. Doc. No. 88, Pretrial order, Uncontested facts, ¶¶ 7.xcviii.a-.xcviii.z.

158. Exhibit P–898, Odom report, Exhibit I, p. 21.

159. Testimony of Otto Candies, Jr., pp. 91–103; Testimony of Otto Candies, III, pp. 410-

16; Exhibit P–923, Depo. testimony of Westhoff, pp. 52–53, 90–91.

160. Exhibit P–923, Depo. testimony of Westhoff, pp. 27–29, 53–54.

161. Testimony of Otto Candies, Jr., pp. 90–103; Testimony of Otto Candies, III, pp. 410–16; Testimony of Odom, pp. 588–90; Exhibit P–898, Odom report, Exhibit I, p. 21.

162. Testimony of Otto Candies, Jr., pp. 100–01.

The anticipated investments for this project were, therefore, allocated proportionately between OCI and CTI based upon the relative available assets of each company during the relevant years.[163] The companies anticipated that they would have to borrow over and above the companies' available assets.[164]

The CSX rail-barge project was never completed. CSX abandoned its consideration of the project in February, 1995, because of the devaluation of the Mexican peso.[165]

### Seamar Join Venture

In late 1992, OCI considered a possible joint venture with Seamar, a competitor of OCI, for the possible acquisition of Seamar's fleet of vessels. The minutes of an OCI's board of directors meeting held on November 24, 1992, show that in order for the joint venture or acquisition to proceed, the board estimated that OCI would have to invest $9,800,000 to pay off Seamar's outstanding debt. The evidence presented at trial showed that the project was considered from at least November, 1992 through July, 1993.[166] During that time, OCI loaned Seamar a total of $2,250,000 secured by first mortgages on Seamar vessels. According to Paul Candies, these loans were unrelated to the $9,800,000 investment, but they were made in an effort to further OCI's joint venture/acquisition opportunity with Seamar.[167] As of April 30, 1992, OCI's management was still pursuing the $9,800,000 joint venture/acquisition opportunity and this continued for several months thereafter. Ultimately, the parties were unable to come to terms and Seamar was purchased by another company.[168]

### Exxon Land Purchase

This project related to OCI's purchase of 19,000 acres of land located in Lafourche Parish, Louisiana, from Exxon, the companies' first customer. Exxon was still a major client and OCI's management believed that the purchase of the property would further its business relationship with Exxon.[169] As Paul Candies stated, although management did not believe that Exxon would cease doing business with the companies if OCI did not purchase the land, the transaction was nevertheless

**163.** Testimony of Otto Candies, Jr., pp. 93, 97–98, 101, 103; Testimony of Otto Candies, III, pp. 412, 414–16; Testimony of Odom, pp. 586–90; Exhibit P–898, Odom report, Exhibit I, pp. 21–25.

For fiscal year 1993, plaintiffs' expert, Michael Odom, determined that OCI had 71% and CTI had 29% of the companies' combined assets and, therefore, they would have contributed $71,000,000 and $29,000,000, respectively, based upon management's expectations of $100,000,000 in costs. For fiscal year 1994, Mr. Odom calculated that OCI had approximately 68% and CTI had approximately 32% of the companies' combined assets and, therefore, the companies would have allocated $68,000,000 to OCI and $32,000,000 to CTI. Exhibit P–898, Odom report, Exhibit I, pp. 23, 25.

**164.** Testimony of Odom, pp. 589–90; Exhibit P–898, Odom report, Exhibit I, pp. 23, 25;

Testimony of Otto Candies, Jr., pp. 101–03; Testimony of Otto Candies, III, pp. 412–13.

**165.** R. Doc. No. 88, Pretrial order, Uncontested facts, ¶ 7, .xcviii.z; Testimony of Otto Candies, Jr., p. 110; Testimony of Otto Candies, III, pp. 413–14; Exhibit P–923, Depo. testimony of Westhoff, pp. 47, 61; Exhibit P–349 (02/13/95 and 02/03/95 letters).

**166.** Exhibit P–898, Odom report, Exhibit I, p. 19.

**167.** Testimony of Paul Candies, p. 251; Exhibit P–898, Odom report, Exhibit I, pp. 19–20.

**168.** Testimony of Paul Candies, pp. 251–52.

**169.** R. Doc. No. 88, Pretrial order, Uncontested facts, ¶ 7 .c.a; Testimony of Paul Candies, pp. 252–53; Exhibit P–898, Odom report, p. 92.

viewed as an opportunity to "continue to negotiate with Exxon to further enhance our relationship.... [I]t just gave us a better opportunity to work with people that we were already good vendors with."[170]

The testimony of the witnesses, along with the minutes of OCI's board of directors meetings and correspondence between OCI and Exxon, evidence that negotiations between the companies spanned the course of two years beginning in November, 1992, when OCI commissioned an independent appraiser to appraise the land.[171] On January 15, 1993, OCI submitted a bid for $1,700,000.[172] OCI's board of directors was aware that Exxon had appraised the land for $2,400,000 and, at its April 12, 1993 meeting, the board authorized up to $2,400,000 for the purchase of the land.[173] In May, 1994, OCI made an offer to Exxon of $2,300,000.[174] The offer was ultimately accepted and the transaction was consummated in December, 1994.[175] Based on the evidence, the Court finds that as of April 30, 1993, and April 30, 1994, management was committed to spending as much as $2,400,000 to purchase the Exxon land.

### KAP Resources Investment

KAP Resources, Ltd. ("KAP Resources") was a Canadian company developing a Chilean copper mine. On April 28, 1994, OCI entered into a private placement subscription agreement to purchase 1,100,261 common shares and 833,531 common shares purchase warrants of KAP Resources for $994,666.[176] It was management's hope and belief that the relationship arising from this investment could lead KAP Resources to charter OCI vessels to transport copper from Chile to the United States. As Paul Candies testified:

> Mr. Plant came to us and said he understood that KAP Resources was going to open a Chilean copper mine, was looking for some investment to facilitate that mine, thought that we could—if we became one of the investors in KAP Resources or one of the bigger investors in KAP Resources, we could expand our ocean freight business to transport the copper from either Chile to Canada where they had a processing facility or Chile to the United States where the copper would be processed.[177]

On May 6, 1994, OCI purchased the KAP Resources shares and warrants as outlined in the April 28, 1994, subscription agreement.[178]

### Candies–Mott International

On August 10, 1995, OCI and Allen Mott established Candies–Mott International, L.L.C. ("Candies Mott"), of which 60 percent was owned by Mott and 40 percent was owned by OCI. Candies–Mott was established to engage in the vessel broker-

---

170. Testimony of Paul Candies, pp. 252–53.

171. Exhibit P–898, Odom report, p. 92; Testimony of Paul Candies, p. 255; R. Doc. No. 65, Stipulation, ¶¶ 74–76.

172. R. Doc. No. 65, Stipulation, ¶ 74.

173. R. Doc. No. 88, Pretrial order, Uncontested facts, ¶ 7, .c.d; Testimony of Otto Candies, Jr., pp. 111–12.

174. R. Doc. No. 88, Pretrial order, Uncontested facts, ¶ 7, .c.f; R. Doc. No. 65, Stipulation, ¶ 163; Testimony of Otto Candies, Jr., p. 112.

175. R. Doc. No. 88, Pretrial order, Uncontested facts, ¶ 7, .c.g; Testimony of Otto Candies, Jr., p. 112.

176. R. Doc. No. 88, Pretrial order, Uncontested Facts, ¶ 7 .ci.a.; R. Doc. No. 65, Stipulation, ¶ 77; Testimony of Paul Candies, p. 258.

177. Testimony of Paul Candies, pp. 257–58.

178. R. Doc. No. 88, Pretrial order, Uncontested facts, ¶¶ 7 .ci.b-.ci.c; Testimony of Paul Candies, p. 258.

age business in Paraguay and, potentially, in other countries.[179] The operating agreement dated October 10, 1995, required OCI to make monthly loans of $30,000 to Candies–Mott for the first twelve months of its operation. According to the terms of the operating agreement, Candies–Mott was to issue a promissory note for each advance and repay the notes with interest at the end of the calendar year. For each subsequent year of Candies–Mott's existence, OCI was to finance Candies–Mott based upon Candies–Mott's expenses for the preceding year.[180]

From August, 1995, to April, 1996, OCI loaned Candies–Mott a total of $270,000 pursuant to the August 10, 1995, operating agreement. Candies–Mott later repaid this amount to OCI.[181] As of April 30, 1996, OCI management expected to fund Candies–Mott for at least another year at the rate of $30,000 per month for a total of $360,000. Otto Candies, III, testified:

At that point in time they had several good projects working. We thought the company was going to continue on at least for another year minimum at that point in time, so we managed to fund it—at least the $30,000 a month—for another year at that point in time.[182]

In fact, after April 30, 1996, OCI funded Candies–Mott for eighteen more months at $30,000 per month. Candies–Mott, however, did not repay any of these additional amounts and, therefore, OCI made no further advances to Candies–Mott.[183]

*Paraguay LPG Transportation*

This was a joint project for OCI and CTI. In 1995, the companies pursued an opportunity, through Allen Mott of Candies–Mott, to construct, prepare, and operate a towboat and two barges to transport liquefied petroleum gas ("LPG") in Paraguay for Petropar, the government-owned oil company of Paraguay.[184] The project was intended to move LPG from the coast upriver to consumers as Paraguay had no pipeline distribution system.[185]

Project development and discussions between the companies began as early as early as March 10, 1995.[186] In April, 1995, representatives of OCI and CTI traveled to Paraguay and met with Paraguayan cabinet-level officials with whom they discussed this project. They also met with the President of Paraguay.[187] On April 21, 1995, Allen Mott sent a letter to a Paraguayan governmental official on behalf of Otto Candies, Jr. and Otto Candies, III, discussing the details of the project.[188] The April 27, 1995, minutes of the OCI board of directors indicate that the company was pursuing a project for "an LPG barge for Paraguay and additional tow-

**179.** R. Doc. No. 88, Pretrial order, Uncontested facts, ¶ 7 .cii .a; Testimony of Otto Candies, III, pp. 416–17.

**180.** R. Doc. No. 88, Pretrial order, Uncontested facts, ¶ 7 .cii .b; Testimony of Otto Candies, III, pp. 417–18.

**181.** R. Doc. No. 88, Pretrial order, Uncontested facts, ¶ 7 .cii .c; Testimony of Otto Candies, III, pp. 417–18.

**182.** Testimony of Otto Candies, III, pp. 418–19.

**183.** R. Doc. No. 88, Pretrial order, Uncontested facts, ¶ 7 .cii .c; Testimony of Otto Candies, III, pp. 419

**184.** R. Doc. No. 88, Pretrial order, Uncontested facts, ¶ 7 .ciii.a; Testimony of Otto Candies, Jr., pp. 116–117; Testimony of Otto Candies, III, pp. 420.

**185.** *Id.*

**186.** Exhibit P–898, Odom report, Exhibit I, p. 32; Exhibit J–267 (04/10/95 fax attaching worksheets).

**187.** Testimony of Otto Candies, III, pp. 421–22.

**188.** R. Doc. No. 88, Pretrial order, Uncontested facts, ¶ 7, .ciii.b; Testimony of Otto Candies, III, p. 422; J–268.

boats/barges to work in the Paraguay and Parana river systems."[189]

On May 3, 1995, Allen Mott sent the companies a worksheet setting forth rate calculations and a $10,145,000 capital budget for this project, consisting of $4,000,000 for each of the two new barges, $1,500,000 for one towboat, and $645,000 in transportation costs.[190] According to management, the companies expected to co-venture this project. The $10,145,000 capital budget referred to in the May 3, 1995, worksheet was to be allocated between OCI and CTI so that OCI paid for the towboat ($1,500,000) and half of the transportation expenses ($322,500) and CTI paid for the remainder.[191]

Otto Candies, Jr. testified that the figures in the May 3, 1995, worksheet were consistent with the figures that management estimated as of April 30, 1995, just three days earlier. As Otto Candies, Jr. stated:

Q. Mr. Candies, that stipulation of the parties indicates that on May 3, 1995, Mr. Allen Mott sent the companies a worksheet setting forth rate calculations and a $10,145,000 capital budget for this project. Is that consistent with your recollection?

A. It is.

Q. Specifically, the stipulation says the capital budget consists of $4 million for each of two barges, $1.5 million for one towboat, and $645,000 in transportation costs. Is that, sir, consistent with your recollection?

A. It is.

 \* \* \* \* \* \*

Q. Can you tell the Court, to the best of your recollection whether those were the numbers the company had in mind as of April 30, some three days earlier?

A. Yes, it is.

Q. Is it consistent with your recollection that those are the numbers that you then had in mind for the Paraguay LPG Transportation Project?

Q. It is.[192]

Otto Candies, Jr.'s testimony was corroborated by that of his son, Otto Candies, III, who similarly testified that as of April 30, 1995, the companies planned to make the $10,145,000 equipment investments detailed on the May 3, 1995, worksheet.[193] To this end, the companies solicited and received blueprints and other design drawings relating to construction of the proposed vessels and the companies spent significant time and effort developing the details of the project.[194] Ultimately, the companies' bid was not accepted as the project was awarded to a South American competitor.[195]

**189.** R. Doc. No. 88, Pretrial order, Uncontested facts, ¶ 7, .ciii.c.; R. Doc. No. 65, Stipulation, ¶ 164.

As Otto Candies, Jr. explained, "The project was to move LPG gas from Buenos Aires [Argentina] up the Parana River on to Asuncion, Paraguay." Testimony of Otto Candies, Jr., p. 116.

**190.** R. Doc. No. 88, Pretrial order, ¶ 7 .ciii.d; Testimony of Otto Candies, Jr., p. 117; DFJ–269.

**191.** R. Doc. No. 88, Pretrial order, ¶ 7 .ciii.h; Testimony of Otto Candies, Jr., p. 119; Testi-

mony of Otto Candies, III, p. 424; Testimony of Odom p. 591; Exhibit P–898, Odom report, Exhibit I, pp. 32–33.

**192.** Testimony of Otto Candies, Jr., pp. 117, 119.

**193.** Testimony of Otto Candies, III, pp. 420–21.

**194.** R. Doc. No. 88, Pretrial order, Uncontested facts, ¶¶ 7 .ciii.e-g.

**195.** Testimony of Otto Candies, Jr., p. 120.

### Morrison–Knudsen Tunnel Project

The minutes of a January 16, 1991, CTI board of directors meeting indicate that Morrison–Knudsen Co. ("Morrison–Knudsen") contacted CTI about possibly providing a barge for a tunnel construction project known as the Boston Harbor Tunnel Project.[196] Morrison–Knudsen was interested in hiring CTI for this project because it owned the only available U.S.-flagged submersible barge, the OC–350, and because it had experience in underwater tunnel construction.[197] However, given that there was no dry dock at Boston Harbor, it was necessary to modify the OC–350 in order to perform the work required by Morrison–Knudsen. Specifically, the OC–350's deck space needed to be increased to allow it to lower as many pre-connected tunnel sections as possible into the water at one time. There was also a possibility that stability columns would have to be added to the barge.[198]

The board minutes show that the board planned to offer Morrison–Knudsen the option of either modifying the OC–350 or building a new one for the project and that the board estimated that modifying the existing barge would cost $1,000,000, while building a new barge would cost between $8,000,000 to $10,000,000. CTI made such an offer to Morrison–Knudsen.[199] The project remained under consideration through April 30, 1991, and for several months thereafter.[200]

At a November 26, 1991, board of directors meeting, the board discussed the status of the Morrison–Knudsen project. The minutes indicate that Morrison–Knudsen requested a quote for adding a 50–foot mid-body section to the OC–350 and that management planned to obtain a quote from Trinity Marine in order to respond to Morrison–Knudsen's inquiry.[201] Negotiations continued for several months following and including April 30, 1992.[202]

As of April 30, 1992, CTI was considering various options for lengthening the OC–350 to gain more deck space. Depending upon the option ultimately selected, management still estimated that the modifications would cost as much as $1,000,000. The $1,000,000 option included adding an extra hull and deck section to lengthen the barge and adding stability columns.[203]

On June 1, 1992, CTI and Bethship–Sparrow Point Yard entered into a contract for the OC–350 to haul tunnel sections for the Morrison–Knudsen Boston tunnel project.[204] Immediately thereafter, CTI put the OC–350 in Bollinger shipyard.[205] On September 4, 1992, Bollinger Machine Shop sent OCI a $435,722 invoice for modifications to the OC–350.[206] According to management, the conversion of

196. R. Doc. No. 88, Pretrial order, Uncontested facts, ¶ 7 .civ .c.

197. Id.; Testimony of Paul Candies, p. 261.

198. Testimony of Paul Candies, pp. 260–62.

199. R. Doc. No. 88, Pretrial order, Uncontested facts, ¶ 7 .civ .a; Testimony of Paul Candies, pp. 261–63.

200. Testimony of Paul Candies, p. 264.

201. R. Doc. No. 88, Pretrial order, Uncontested facts, ¶ 7 .civ .b; Exhibit J–91 (11/26/91 OCI minutes).

202. Exhibit P–898, Odom report, Exhibit I, p. 38.

203. Testimony of Paul Candies, pp. 261–65.

204. R. Doc. No. 65, Stipulation, ¶ 84; Testimony of Paul Candies, p. 263.

205. Testimony of Paul Candies, p. 265.

206. R. Doc. No. 65, Stipulation, ¶ 85.

the OC–350 that was ultimately completed at a cost of $435,722 included less deck space and it was, therefore, less costly than that which was originally contemplated as of April 30, 1991 and April 30, 1992.[207] In fact, it was not until the OC–350 had been sent to the Bollinger Shipyard in June, 1992, that it was decided that the barge would undergo less extensive modifications.[208] As Paul Candies testified:

Q. If the actual invoice from Bollinger Shipyard came in September of 1992, could you tell the Court how long before that a decision was made as to what modifications would be done and how much they would cost, sir?

A. We put the barge in June, so immediately upon decisions being made we put the barge in and put the barge on charter to Morrison–Knudsen and the modification was done there.

Q. As of April 30, 1991, had a decision already been made that only $435,000 in modifications would be done?

A. No.

Q. As of April 30, 1992, had such a decision been made?

A. No.

\* \* \* \* \* \*

Q. As of April 30, 1991 and April 30, 1992, what was the amount that was estimated by management of CTI that would have to be expended to complete the project?

A. $1 million for the barge.[209]

### Freeport Phosphoric Acid Barge

In 1992, Freeport McMoRan ("Freeport") contracted with OCI to build and operate a new barge to transport phosphoric acid between Tampa, Florida, and Taft, Louisiana.[210] At an April 20, 1992, meeting, OCI's and CTI's board of directors approved a $7,500,000 budget, consisting of $5,100,000 to build a new barge and the remainder to modify existing equipment for Freeport's phosphoric acid transportation needs.[211] As of April 30, 1992, management anticipated making a total investment of $7,500,000 in the Freeport project.

On May 18, 1992, OCI and McDermott entered into a contract[212] for the construction of a new barge for the price of $5,131,043.[213] OCI began making barge construction progress payments on May 19, 1992, and by the end of October, 1992,

---

**207.** Testimony of Paul Candies, p. 265.

**208.** *Id.* at pp. 264–66.

**209.** Testimony of Paul Candies, pp. 265–66.

**210.** R. Doc. No. 88, Pretrial order, Uncontested facts, ¶ 7, .cv .a; Testimony of Otto Candies, III, p. 425.

**211.** R. Doc. No. 65, Stipulation, ¶ 158; Testimony of Otto Candies, III, pp. 425–26.

**212.** Although CTI generally owned non-powered vessels, including barges, Paul Candies testified that in dealings with third parties, OCI, not CTI, was the contact point for both companies, even when CTI's barge business was involved. Paul Candies testified:

> ... Basically, Otto Candies [OCI] would be the contact point to where most of the customers would come in and Otto Candies would then decide whether it was a barge job or a boat job or a combination of both, but all administrative work would have been handled at Otto Candies.

Testimony of Paul Candies, p. 195. Although OCI initially entered into this contract with McDermott, this was in fact a CTI project. Testimony of Otto Candies, III, pp. 425–30.

**213.** R. Doc. No. 88, Pretrial order, Uncontested facts, ¶ 7 .cv.c; Testimony of Otto Candies, III, p. 426.

OCI had paid McDermott a total of approximately $1,800,000.[214]

After McDermott began building the barge, a dispute arose between McDermott and CTI concerning the progress of construction. Because of the dispute, McDermott stopped work on the barge, OCI stopped making progress payments, and the Freeport contract was cancelled.[215]

On January 14, 1993, McDermott filed a petition for declaratory judgment against OCI in the 16th Judicial District Court, Parish of St. Mary, Louisiana. McDermott sought $4,900,000 in damages.[216] As of April 30, 1993, OCI's financial statements reflect that management estimated that it might need to pay a $4,900,000 judgment in the McDermott litigation.[217] As of April 30, 1994, OCI's financial statements reflect that management estimated that it might need to pay a $5,454,000 judgment in the McDermott litigation.[218] On January 8, 1996, the lawsuit was finally settled with CTI paying McDermott $6,750,000.[219] From April 30, 1994, through the settlement of the lawsuit, management believed that it was neces-sary to retain assets to satisfy any judgment rendered against OCI.[220]

### Cargill Ammonia Barge

In late 1992 or early 1993, Cargill contacted the companies to charter a barge to move ammonia from Tampa, Florida, to ports in New Orleans, Louisiana, Port of Spain, Trinidad, and Coatzacoalcas, Mexico.[221] The March 1, 1993, board of directors minutes of OCI and CTI mentioned Cargill's interest in chartering an ammonia barge and further discussed the possibility of converting or building such a barge.[222] In connection with this project, CTI engaged in numerous discussions with Design Associates, Inc., Trinity Marine Group, and Northstar Marine Services to develop a design and specifications for the ammonia barge.[223] It also solicited architectural drawings and operating cost estimates relating to the barge construction which estimates were submitted as part of its bid.[224] On March 18, 1993, Otto Candies, Jr. sent a fax to Cargill attaching assumptions relating to the barge characteristics and estimating that such a barge would cost $13,000,000.[225] According to the testimony of Otto Candies, Jr., CTI's bid of

---

**214.** R. Doc. No. 88, Pretrial order, Uncontested facts, ¶ 7 .cv.d.

**215.** R. Doc. No. 88, Pretrial order, Uncontested facts, ¶ 7 .cv.g.

**216.** *Id.;* Testimony of Otto Candies, III, pp. 427–28.

**217.** R. Doc. No. 88, Pretrial order, Uncontested facts, ¶ 7 .cv.i; Testimony of Otto Candies, III, 427–28; DFJ–41.

**218.** R. Doc. No. 88, Pretrial order, Uncontested facts, ¶ 7 .cv.j; Testimony of Otto Candies, III, pp. 428–30; DFJ–42.

The report of plaintiff's expert, Michael Odom, notes that although the lawsuit filed against OCI originally demanded damages totaling $4,900,000, that damage claim was amended to $5,454,000. Exhibit P–898, Odom report, Exhibit I, p. 46.

**219.** The parties do not dispute that CTI paid the settlement amount. It is further undisputed that as of April 30, 1996, CTI had spent approximately $2,000,000 in legal fees connected with the McDermott litigation. R. Doc. No. 88, Pretrial order, Uncontested facts, ¶¶ 7 .cv.k.-.cv.l; Testimony of Otto Candies, III, p. 429.

**220.** Testimony of Otto Candies, III, p. 430.

**221.** R. Doc. No. 88, Pretrial order, Uncontested facts, ¶ 7 .cvi .c.

**222.** R. Doc. No. 88, Pretrial order, Uncontested facts, ¶ .cvi.a.

**223.** Exhibit P–898, Odom report, p. 93.

**224.** *Id.*

**225.** Testimony of Otto Candies, Jr., pp. 122–23; Exhibit J–302 (03/18/93 letter).

March 18, 1993, was outstanding as of April 30, 1993, and discussions with Cargill continued for several months thereafter.[226] The project, however, was ultimately not awarded to CTI.

### Project Summary

Based on his review of documents and information related to dozens of potential projects that were considered for investment by OCI and CTI, as well as his discussions with management of the companies regarding those projects, Mr. Odom determined that each of the above-described projects involved real business opportunities that the companies pursued with serious interest and attention and that all of them were viable and outstanding as of the end of one or more years in question.[227] Consideration of the projects generally required a significant time commitment by management and in some instances the investment of funds for vessel specifications and marine architectural drawings. The potential projects are summarized as follows, together with the amount of investment that would have been required to complete each such project:

226. Testimony of Otto Candies, Jr., pp. 123–24; Exhibit P–898, Odom report, Exhibit I, p. 43.

227. Testimony of Odom, pp. 581–83; 585–86; Exhibit P–898, Odom report, pp. 86–88.

| | 4/30/91 | 4/30/92 | 4/30/93 | 4/30/94 | 4/30/95 | 4/30/96 |
|---|---|---|---|---|---|---|
| *OCI* | | | | | | |
| American Gulf | $ | $5,000,000 | $5,000,000 | | | |
| Gardinier Sulfur Barge | $ 5,000,000 | | | | | |
| Freeport Sulphur Tankers | | $10,000,000 | | | | |
| OPI | $ 3,000,000 | | | | | |
| Lykes Brothers | | $10,000,000 | | | | |
| Freeport New Discovery | $14,850,000 | | | | | |
| Seamar | | | $9,800,000 | | | |
| CSX | | | $71,000,000 | $68,000,000 | | |
| Exxon Land | | | $ 2,400,000 | $ 2,400,000 | | |
| Hall-Houston | $ 5,000,000 | | | | $4,000,000 | $3,900,000 |
| KAP Resources | | | | $ 994,666 | | |
| Candies-Mott | | | | | | $ 360,000 |
| Paraguay LPG | | | | | $1,822,500 | |
| MSRC | $75,600,000 | | | | | |
| *Totals - OCI* | $103,450,000 | $25,000,000 | $88,200,000 | $71,394,666 | $ 5,822,500 | $ 4,260,000 |
| | | | | | | |
| *CTI* | | | | | | |
| Morrison-Knudson | $1,000,000 | $ 1,000,000 | | | | |
| Freeport Phosphoric Acid Barge | | $ 7,500,000 | $ 4,900,000 | $ 5,454,000 | $ 5,454,000 | |
| MSRC | $29,400,000 | | | | | |
| CSX | | | $ 29,000,000 | $ 32,000,000 | | |
| Cargill | | | $ 13,000,000 | | | |
| Freeport New Discovery | $15,400,000 | | | | | |
| Paraguay LPG | | | | | $ 8,322,500 | |
| *Totals - CTI* | $45,800,000 | $ 8,500,000 | $46,900,000 | $37,454,000 | $13,776,500 | |

Significantly, defendant offered no direct evidence at trial which would contradict evidence offered by plaintiffs that they had legitimate business reasons to invest in the projects previously identified. Furthermore, defendant did not contradict plaintiffs' evidence regarding their plans to use their accumulated funds to invest in those projects.

### Working Capital

The companies also required working capital which would be used in day-to-day operations.[228] As Dr. Blaydon explained, working capital is used to cover the time lag between when a company's expenses must be paid and when the company receives payment from its customers for the goods or services provided.[229] According

228. Testimony of Otto Candies, Jr., p. 135; Testimony of Paul Candies, pp. 268–70; Testimony of Otto Candies, III, p. 402; Testimony of Blaydon, pp. 688–91; Exhibit P–899, Blaydon report, p. 57.

229. Testimony of Blaydon, pp. 688–91.

to management, having sufficient working capital is important for the companies given that both OCI and CTI sometimes use their billing cycle as a competitive tool, offering customers the ability to defer payments.[230] During the years in question, management believed that the companies needed, on a combined basis, between $12,000,000 and $20,000,000 for both working capital and unanticipated special projects that might arise during the coming year.[231]

At the request of plaintiffs' counsel, Dr. Blaydon calculated the amount of working capital that he would have recommended each of the companies have available at the end of each year at issue. Dr. Blaydon used historical data to calculate the number of days needed to turn over both accounts receivable and accounts payable, subtracting the payables cycle from the receivables cycle, and multiplying the resulting total operating cycle by annual operating expenses.[232] By adding one standard deviation to the relevant expenses, this annual amount was adjusted to account for industry volatility.[233] This formula resulted in the following projected working capital needs:

| | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 |
|---|---|---|---|---|---|---|
| OCI | $4,000,000 | $4,500,000 | $5,200,000 | $7,200,000 | $7,000,000 | $7,100,000 |
| CTI | $ 400,000 | $ 800,000 | $1,000,000 | $1,300,000 | $1,500,000 [234] | |

Defendant did present direct evidence in opposition to plaintiffs' working capital claim. That evidence, however, demonstrates that in some fiscal years, the differences between the plaintiffs' and the defendant's amount of required working capital are relatively insignificant. Defendant concedes that the companies had a reasonable business need to retain the following amounts for working capital:

| | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 |
|---|---|---|---|---|---|---|
| OCI | $3,951,000 | $4,218,000 | $4,647,000 | $6,285,000 | $6,596,000 | $5,824,000 |
| CTI | $ 285,000 | $ 143,000 | $ 153,000 | $ 208,000 | $ 259,000[235] | |

The above figures represent amounts identified by defendant's expert witness, Dr. Raymond Ball, who was asked to analyze plaintiffs' working capital needs. Dr. Ball is a professor of accounting at the University of Chicago's graduate school of

**230.** Testimony of Paul Candies, pp. 270–71; Testimony of Blaydon, p. 710; Exhibit P–899, Blaydon report, p. 57.

**231.** Testimony of Otto Candies, Jr., pp. 133–35.

**232.** Exhibit P–899, Blaydon report, pp. 59–60.

**233.** Testimony of Blaydon, p. 691; Exhibit P–899, Blaydon report, pp. 60.

As Dr. Blaydon explains:
Standard deviation is a measure of volatility around the average. Using statistical theory, and assuming certain characteristics of the underlying data, standard deviations around the mean can be used to approximate the probability that an event will occur. For example, the general rule of thumb is that there is a 68 percent probability an event will occur within one standard deviation around the mean. There is a 95 percent probability that an event will occur within two standard deviations around the mean.
Exhibit P–899, Blaydon report, p. 60 n. 124.

**234.** Testimony of Blaydon, p. 692; Exhibit P–899, Blaydon report, p. 61.

**235.** R. Doc. No. 88, Pretrial order, Uncontested facts, ¶¶ 7.cviii, 7.cix; Testimony of Dr. Ball, pp. 777–80.

business who qualified as an expert in accounting as well as financial statements analysis, cash flow .needs analysis, and working capital needs analysis.[236]

Dr. Ball conducted an analysis using composite data gathered from a group of companies that he deemed comparable to OCI and CTI. The companies Dr. Ball relied upon included companies in the stevedoring, marina, yacht basin, and log rafting businesses, as well as companies offering swamp buggy rides. Dr. Ball was unable to list characteristics which those companies shared with OCI and CTI, except to say that they were all involved in water transportation and had similar operating cycles.[237] Dr. Ball did not use OCI's and CTI's own data. He did not research the nature and purpose of the companies' activities before choosing comparable firms and he did not inquire whether his selected comparable companies experienced financial and economic conditions like those experienced by the companies.[238] Finally, instead of conducting a separate billing cycle analysis for each year, Dr. Ball applied a single average billing cycle, including aggregate data from 1991 through 1996, in order to estimate the working capital needs of OCI and CTI for each year.[239]

In considering the testimony of both experts, the Court finds that Dr. Blaydon's working capital analysis provides a basis for determining the reasonable working capital needs of OCI and CTI at it uses the companies' own data and it takes into con-sideration the unique aspects of the companies' operations. Dr. Ball's analysis provides a basis for determining ·the working capital needs of OCI and CTI based upon data from a group of companies having little in common with OCI and CTI. Dr. Ball's analysis, therefore, does not reliably determine the companies' working capital needs in each year and the Court will not rely on his analysis in arriving at its decision.

### Shareholder Redemption

It has always been important to the Candies that the companies remain closely held entities. To that end, on November 1, 1990, the companies and their shareholders entered into stock redemption agreements that obligated the companies to redeem all shares tendered by a deceased shareholder's family.[240] Management, therefore, believed it was necessary for the companies to retain sufficient funds to redeem a shareholder, if such a situation arose, in any given year.[241]

Dr. Blaydon testified as to the amount of funds he would have advised OCI and CTI to maintain for this redemption prospect. Using valuations of the companies conducted in 1990 and 1993, Dr. Blaydon multiplied the most recently available valuation for a given tax year by the fraction of stock held by the largest shareholder (i.e., 33%).[242] Dr. Blaydon concluded that he would have recommended that the companies retain the following amounts for shareholder redemption:

236. Testimony of Ball, pp. 738–741.

237. Testimony of Ball, pp. 812–13.

238. Testimony of Ball, pp. 806–22; Exhibit D–74, Ball report, pp. 13–14, 16.

239. Exhibit D–74, Ball report, pp. 7, 19.

240. R. Doc. No. 88, Pretrial order, Uncontested facts, ¶ 7 .cxi; Testimony of Paul Candies, pp. 271–72.

241. Testimony of Paul Candies, p. 271.

242. Testimony of Blaydon, pp. 696–97; Exhibit P–899, Exhibit P–899, Blaydon report, pp. 62–63.

243. Exhibit P–899, Exhibit P–899, Blaydon report, pp. 63–64

| | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 |
|---|---|---|---|---|---|---|
| OCI | $5,300,000 | 5,300,000 | 5,300,000 | 15,900,000 | 15,900,000 | 15,900,000 |
| CTI | $1,200,000 | 1,200,000 | 1,200,000 | 8,100,000 | 8,100,000[243] | |

Defendant presented no direct evidence at trial which contradicted the amounts recommended by Dr. Blaydon or the evidence presented by plaintiffs concerning their need to accumulate such funds for shareholder redemption.

## Total Business Needs

In sum, plaintiffs conclude that OCI and CTI had reasonable business needs to accumulate the following amounts during the years in question:

| | | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 |
|---|---|---|---|---|---|---|---|
| OCI | Fleet replacement | $39,800,000 | $42,900,000 | $48,400,000 | $49,000,000 | $57,400,000 | $37,200,000 |
| | Projects | 103,450,000 | 25,000,000 | 88,200,000 | 71,394,666 | 5,822,500 | 4,260,000 |
| | Working capital | 4,000,000 | 4,500,000 | 5,200,000 | 7,200,000 | 7,000,000 | 7,100,000 |
| | SH redemption | 5,300,000 | 5,300,000 | 5,300,000 | 15,900,000 | 15,900,000 | 15,900,000 |
| | TOTAL | $152,550,000 | $77,700,000 | $147,100,00 | $143,494,666 | $86,122,500 | $64,460,000 |
| CTI | Fleet replacement | 11,900,000 | 12,200,000 | 12,600,000 | 15,100,000 | 16,500,000 | |
| | Projects | 45,800,000 | 8,500,000 | 46,900,000 | 37,454,000 | 13,766,500 | |
| | Working capital | 400,000 | 800,000 | 1,000,000 | 1,300,000 | 1,500,000 | |
| | SH redemption | 1,200,000 | 1,200,000 | 1,200,000 | 8,100,000 | 8,100,000 | |
| | TOTAL | $59,300,000 | $22,700,000 | $61,700,000 | $61,954,000 | $39,866,500[244] | |

### Companies' Available Assets

Plaintiffs also presented evidence regarding the assets that the companies had available during the years in question to meet their quantified business needs. Plaintiffs contend that not all of the assets on the companies' books as of the end of each year in question were available for distribution to shareholders or to meet the identified business needs. Assets already employed in the companies' business, such as real estate used in operations, vessels and related support equipment, and investments in affiliates, customers, suppliers, and joint venturers, were investments made to benefit the companies and were, therefore, unavailable to meet business needs or to be distributed.[245] Paul Candies testified as to the details of each investment which plaintiffs identified as unavailable and the defendant contradicted none of that testimony.[246]

Plaintiffs' counsel asked Dr. Blaydon to calculate the amount of assets available to meet the companies' needs in each year in question. Dr. Blaydon examined six categories of potentially available assets.[247] Assets which Dr. Blaydon classified as available were those assets that if liquidated, distributed, or used to meet reasonable business needs of the companies, would not significantly impair the core operations of the businesses.[248] Assets that were being used for purposes related to

244. R. Doc. No. 75, Plaintiffs' post–trial proposed findings of fact and conclusions of law, p. 70.

245. Exhibit P–899, Blaydon report, pp. 69–73.

246. Testimony of Paul Candies, pp. 275–84, 376–77.

247. Exhibit P–899, Blaydon report, pp. 69–72.

248. Testimony of Blaydon, pp. 698–99.

maintaining or growing the core businesses were not considered available.[249] As Dr. Blaydon explained, the marine vessels and the companies' land used for office space, although corporate assets, were not available to meet the business needs of the companies.[250]

Dr. Blaydon analyzed six categories of potentially available corporate assets reflected on the companies' balance sheets.[251] Dr. Blaydon classified (1) cash and marketable securities as available; (2) business-related investments in public securities, such as stock of publicly traded companies, as available;[252] (3) other current assets net of liabilities as available; (4) capital financing and other less liquid investments unrelated to the companies' core marine transportation operations as available; (5) private investments related to the companies' core business, such as investments in privately held oil and gas companies like Hall–Houston, as not available; and (6) investments in subsidiaries and related entities as not available.[253]

This analysis led to the following net available assets totals:

| | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 |
|---|---|---|---|---|---|---|
| OCI | $41,100,000 | 40,400,000 | 42,900,000 | 41,500,000 | 33,500,000 | 35,800,000 |
| CTI | $15,100,000 | 19,600,000 | 16,900,000 | 20,200,000 | 21,000,000[254] | |

The classifications employed by Dr. Blaydon were confirmed by the testimony of Paul Candies.[255] Defendant offered no direct evidence contradicting the plaintiffs' evidence regarding their available assets. The only challenges by defendant to Dr. Blaydon's assessment of available assets relate to a few of OCI's business related private investments which Dr. Blaydon classified as unavailable. Specifically, defendant avers that OCI's investments in KAP Resources, Hall–Houston and Bollinger Quick Repair were unrelated to OCI's business and, therefore, should have been considered available to meet the reasonable business needs of the companies.[256] After hearing the testimony of Dr. Blaydon as corroborated by that of Paul Candies, the Court is satisfied that those investments were sufficiently related to the companies' core business in that they either secured or had the potential of securing a significant amount of work for the companies as in the case of the investments in Hall–Houston and KAP Resources.[257] As in the case of the invest-

249. Exhibit P–899, Blaydon report, p. 69.

250. Id.

251. Exhibit P–899, Blaydon report, p. 70.

252. Dr. Blaydon testified that although these investments were related to the companies' business because they were made for the purpose of establishing a positive relationship with another company, he nevertheless considered them available since the investments were in publicly-traded securities and they could have been liquidated quickly for "something as important as a program of fleet replacement." Testimony of Blaydon, p. 698; Exhibit P–899, Blaydon report, pp. 70–71.

253. Exhibit P–899, Blaydon report, pp. 70–72, and attached Appendix G; Testimony of Blaydon, pp. 698–99.

254. Exhibit P–899, Blaydon report, pp. 72–73.

255. Testimony of Paul Candies, pp. 257–59, 277–84.

256. R. Doc. No. 82, Defendant's post-trial proposed findings of facts and conclusions of law, pp. 89–90.

257. As previously discussed, Paul Candies testified that the KAP Resources investment was made with the specific intention of securing marine transportation business from KAP's Chilean copper mines, and it was, therefore, related to the companies' business. Testimo-

ment in Bollinger Quick Repair, Inc., the investments also provided the companies with services directly linked to their operations.[258]

Cyrus J. Fanguy, the IRS agent who audited plaintiffs' tax returns, testified regarding the findings and calculations which led to the imposition of accumulated earnings taxes on OCI and CTI for the years in question. Significantly, Mr. Fanguy testified that his sole reason for concluding that the companies had improperly accumulated earnings in excess of the reasonable needs of the business was a lack of sufficient information about the companies' business needs and available assets.[259] After hearing the testimony of Mr. Fanguy, the Court is of the opinion that Mr. Fanguy was simply not provided with all the testimony and evidence presented at trial and, therefore, he lacked the necessary information to make the appropriate calculations.

### Shareholders' Motivation for Retaining Earnings

The Candies family members testified that to the extent that management retained earnings and profits and did not pay dividends to shareholders prior to or during the years in question, they did so to meet the reasonable business needs identified above.[260] As Otto Candies, Jr. stated:

> We needed the money in the business because if ever business started again we needed our money to move quickly. We need to be a viable competitor. We had to keep our fleets modern. We had to keep our company together.[261]

Otto Candies, Jr.'s testimony was corroborated by that of Paul Candies who testified that the sole motivation for retaining funds in the companies was to preserve the assets of the business for future operations and expansion.[262] These practices were not motivated to avoid income tax. The Candies family members all testified that after having weathered the industry downturn of the 1980s and having witnessed the disappearance of competitors and other industry members from the market as their businesses failed, the companies' management was especially mindful during the years in question that the companies could only survive through prudent and conservative decision making.[263]

Mr. Odom evaluated what the financial and operating impact on the companies would have been had they distributed the assets that defendant alleges were improperly accumulated. His analysis showed,

ny of Paul Candies, pp. 257–59. Similarly, the investment in Hall–Houston secured a significant amount of marine transportation work for the companies which continues through the present. R. Doc. No. 88, Pretrial order, Uncontested facts, ¶ 7 .xcii.g.

**258.** Bollinger Quick Repair, formerly known as Avondale Quick Repair in Harvey, Louisiana, was a shipyard providing vessel repair services. In 1993, management was approached by Donald Bollinger who proposed that management assist him in purchasing the shipyard. OCI made an $8,000,000 investment in 1994. Paul Candies testified that management believed that making the investment would provide the companies with opportunities for more readily available vessel repair services at this and other shipyards owned by Donald Bollinger. The investment,

according to Paul Candies, would enhance the companies' relationship with Mr. Bollinger and would preserve the shipyard as an active operating yard. Testimony of Paul Candies, pp. 278–81.

**259.** Testimony of Fanguy, p. 542.

**260.** Testimony of Otto Candies, Jr., pp. 135–37; Testimony of Paul Candies, p. 307.

**261.** Testimony of Otto Candies, Jr., p. 137.

**262.** Testimony of Paul Candies, p. 307.

**263.** Testimony of Otto Candies, pp. 38–39, 135; Testimony of Paul Candies, pp. 199–201, Testimony of Kevin Candies, pp. 385–87, 393–94; Testimony of Otto Candies, III, p. 402.

for example, that OCI's net available assets to meet business needs at the end of the 1996 fiscal year would have dropped from $34,600,000 to $8,800,000 if OCI had distributed the earnings that defendant alleges were improperly accumulated from 1991 through 1996. CTI's net available assets to meet business needs would have similarly dropped from $21,000,000 to $4,900,000 from 1991 to 1995.[264] Mr. Odom concluded that such distributions would have significantly weakened the companies, impaired their reputation such that certain business opportunities might no longer be available to them, and "lessened [the companies'] prospects for survival."[265] Mr. Odom also concluded that the companies "would have had a problem replacing their vessel fleet because vessels are expensive and they would not have had the cash to do that."[266]

From time to time, OCI also made loans to one or more shareholders, never proportionate to their interest in the companies, which were collateralized and accrued interest. OCI had the ability to demand repayment at any time and some payments have been made.[267] The Candies family members testified that OCI made these loans, rather than paying dividends, because management wanted to be assured that it could get the money back whenever it might be needed for the business.[268] During the course of business, OCI management also used corporate funds to pay for business related expenses, including expenses to entertain business contacts.[269] From time to time, some of these expenses were personal expenditures which were charged to OCI.[270] However, management testified that OCI had an established procedure for ensuring that shareholders and other employees were charged back for personal expenses that were initially charged as a business expense.[271] Any personal items not properly charged back to the shareholders were inadvertent bookkeeping errors.[272] This testimony was uncontroverted by the defendant and the Court found the testimony of management to be credible in this regard.

## II.

This Court has jurisdiction pursuant to 28 U.S.C. § 1346 and 26 U.S.C. § 7422 as this is a lawsuit seeking refund of federal taxes, penalties and interest assessed and collected by defendant, the United States of America. Venue is proper in the Eastern District of Louisiana pursuant to 28 U.S.C. § 1402(a)(2) inasmuch as OCI and CTI are corporations having their principal place of business within this district.

 This case is governed by the provisions of 26 I.R.C. §§ 531 through 537 of the United States Code. 26 I.R.C. §§ 531 through 537 provide for the assessment of

---

264. Testimony of Odom, pp. 573–77; Exhibit P–898, Odom report, pp. 71–77 and attached Exhibit G.

265. Testimony of Odom, p. 576.

266. Testimony of Odom, p. 576.

267. Testimony of Otto Candies, Jr., p. 136; Testimony of Paul Candies, pp. 293–94; Testimony of Kevin Candies, pp. 388–91.

268. Testimony of Otto Candies, Jr., pp. 136–37; Testimony of Paul Candies, pp. 306–07; Testimony of Kevin Candies, pp. 393–94.

269. Testimony of Otto Candies, Jr., pp. 164–75; Testimony of Paul Candies, pp. 313, 369–71.

270. Testimony of Otto Candies, Jr., p. 166.

271. Testimony of Otto Candies, Jr., pp. 166–67, 182–83; Testimony of Paul Candies, p. 312.

272. *Id.*

accumulated earnings tax on a corporation "formed or availed of for the purpose of avoiding the income tax with respect to its shareholders by permitting earnings and profits to accumulate instead of being divided or distributed." 26 I.R.C. § 532(a). A corporation is not subject to an accumulated earnings tax "if its accumulations are required for the 'reasonable needs of the business.'" 26 I.R.C. § 535(c)(1); *J.H. Rutter Rex Mfg. Company, Inc. v. Commissioner of Internal Revenue*, 853 F.2d 1275, 1278 n. 4 (5th Cir.1988)("26 I.R.C. §§ 531–537, impose an accumulated earnings tax on that portion of the earnings of a corporation that has been accumulated in excess of the corporation's 'reasonable business needs' for the purpose of avoiding the taxation of those amounts as dividends in the hands of the corporation's shareholders"). Therefore, there are two elements to the assessment of the tax: (1) accumulation of earnings and profits beyond the reasonable needs of the corporation, and (2) an intent to avoid shareholder taxes. *J.H. Rutter Rex Mfg. Company Inc.*, 853 F.2d at 1285. In an action for refund of accumulated earnings taxes, the taxpayer bears the burden of proving the reasonable needs for its accumulations and the absence of the proscribed purpose. *EMI Corporation v. Commissioner*, 50 T.C.M. (CCH) 569, 583 (1985); *King v. United States*, 641 F.2d 253, 259 (5th Cir. 1981). Further, the Court notes that insofar as "the accumulated earnings tax is a penalty tax paid in addition to the regular tax on corporate earnings, it is to be strictly construed." *Rutter Rex*, 853 F.2d at 1286.

■ In order to determine whether a corporation is subject to accumulated earnings tax, the Court must conduct a three part analysis. First, the reasonable needs of the business are determined. 26 I.R.C. § 537; *EMI Corporation*, 50 T.C.M. (CCH) at 582; *Salley v. United States of America*, 1976 WL 1157, *6–7 (W.D.La. Mar. 18, 1976). As will be discussed below, the reasonable needs of a corporation include "both its present day-to-day operating needs (which is referred to as 'working capital' needs) and its reasonably anticipated future needs." *Salley*, 1976 WL 1157 at *6. After the reasonable needs of the business are determined, that amount "must then be compared with the funds that the corporation actually has available to meet these needs." *Id.* at *7. Available funds are those funds reflected in net liquid assets that are unrelated to the taxpayer's business.[273] *Id.* at *12; *EMI Corporation*, 50 T.C.M. (CCH) at 583. Therefore, assets which are liquid but business related are not considered assets that are available to meet the reasonable needs of the business. *Hughes, Inc. v. Commissioner*, 90 T.C. 1, 22–24, 1988 WL 65 (1988). Further, to the extent that previously accumulated earnings and profits in the form of liquid assets from prior years are sufficient to meet the corporation's reasonable needs for the year, current earnings are excess and are deemed to be distributable. *Rutter Rex*, 853 F.2d at 1285.

■ If, after making the above stated comparison, the corporation has more funds or accumulated earnings available than it has business needs, this excess is subject to the accumulated earnings tax. *Salley*, 1976 WL 1157 at *7. On the other hand, "if the corporation has less funds available than it has needs for, there is no accumulated earnings tax due." *Id.*

---

273. In *Ivan Allen Co. v. United States*, 422 U.S. 617, 628, 95 S.Ct. 2501, 2507, 45 L.Ed.2d 435 (1975), the Supreme Court stated, "The question . . . is not how much capital of all sorts, but how much in the way of quick or liquid assets, it is reasonable to keep on hand for the business."

Various treasury regulations have been promulgated pursuant to "26 I.R.C. § 537 to provide a framework for evaluating the reasonable needs of a business." *Rutter Rex*, 853 F.2d at 1286. Treas. Reg. § 1.537–(1)(a)[274] provides in pertinent part:

> An accumulation of the earnings and profits (including the undistributed earnings and profits of prior years) is in excess of the reasonable needs of the business if it exceeds the amount that a prudent businessman would consider appropriate for the present business purposes and for the reasonably anticipated future needs of the business.

An accumulation to provide necessary working capital for the business constitutes a reasonable present business need. Treas. Reg. § 1.537–2(b)(4). Working capital "is the money a corporation needs to survive on a day-to-day basis and would include money to buy raw materials, to pay for labor costs, and to cover overhead costs." *Rutter Rex*, 853 F.2d at 1286 n. 14. "Reasonably anticipated future needs of a business are those beyond the day-to-day working capital needs of a business" and include, among others, the need (1) to provide for bona fide expansion of business or replacement of plant; (2) to acquire a business enterprise through purchasing stock or assets; and (3) to provide for investments or loans to suppliers or customers if necessary in order to maintain the business of the corporation.[275] *Rutter Rex*, 853 F.2d at 1286; Treas. Reg. § 1.537–2(b).

■ Treas. Reg. § 1.537–1(b)(1) further provides that in order to qualify as a reasonably anticipated business need, a corporation must have specific, definite, and feasible plans for the use of the accumulation. The accumulation, however, does not have to "be used immediately, nor must the plans for its use be consummated within a short period after the close of a taxable year." Treas. Reg. § 1.537–1(b)(1); *Rutter Rex*, 853 F.2d at 1292. Further, in a closely held corporation, it is not necessary that the plans be memorialized in formal corporate minutes. *Salley*, 1976 WL 1157 at *10; *EMI Corporation*, 50 T.C.M. (CCH) at 582. Rather, "[t]he test is whether the taxpayer['s] intent to undertake the plan is manifested by some 'substantial active move toward implementation,' such as incurring expenditures to further the plan." *Rutter Rex*, 853 F.2d at 1292 (citing *Motor Fuel Carriers, Inc. v. Commissioner*, 559 F.2d 1348, 1352 (5th Cir.1977); see also, *Hogg's Oyster Company, Inc. v. United States*, 676 F.2d 1015, 1018 (4th Cir.1982))("[S]ome steps must have been taken toward [the plan's] realization"); *Battelstein Investment Company v. United States*, 302 F.Supp. 320, 327

---

**274.** Citations to the relevant treasury regulations contained in the Code of Federal Regulations, 26 C.F.R. are noted as "Treas. Reg. § # ).

**275.** Treas. Reg. § 1.537–2(b) also lists the following non-exclusive uses of corporate funds which may indicate that a corporation's accumulations are not for the reasonable needs of the business. These include:

> (1) Loans to shareholders, or the expenditure of funds of the corporation for the personal benefit of the shareholders;
> (2) Loans having no reasonable relation to the conduct of the business made to relatives or friends of shareholders, or to other persons;
> (3) Loans to another corporation, the business of which is not that of the taxpayer corporation, if the capital stock of such other corporation is owned, directly or indirectly, by the shareholder or shareholders of the taxpayer corporation and such shareholder or shareholders are in control of both corporations;
> (4) Investments in properties, or securities which are unrelated to the activities of the business of the taxpayer corporation; or
> (5) Retention of earnings and profits to provide against unrealistic hazards.

(S.D.Tx.1969), *aff'd*, 442 F.2d 87 (5th Cir. 1971)("[Plans] must be manifested by a contemporaneous course of conduct").

█ When determining the reasonably anticipated needs of the business, one must look to the facts as they existed at the close of the taxable year. Treas. Reg. § 1.537–1(b)(2). Hindsight cannot be used against the taxpayer. *Id.* In determining whether a reasonably anticipated need of the business existed at the close of any given taxable year, "subsequent events shall not be used for the purpose of showing that the retention of earnings or profits was unreasonable at the close of said taxable year." *Id.* Subsequent events, however, "may be considered to determine whether the taxpayer actually intended to consummate or has actually consummated the plans for which the earnings and profits were accumulated." *Id.*

 Whether a corporation's "accumulation of earnings and profits is in excess of the reasonable needs of its business is a question of fact." *Rutter Rex*, 853 F.2d at 1285. In determining the reasonable needs of the business for purposes of the accumulated earnings tax, the courts must give great deference to the business judgment of corporate management. *Id.* at 1285–86; *Knight Furniture Co., Inc. v. Commissioner*, 81 T.C.M. (CCH) 1069, 1074 (2001)("[D]etermining the reasonable needs of a business is, in first instance, a question for the officers and directors of the corporation. Courts should be hesitant to substitute their judgment and attribute tax-avoidance motive unless the facts and circumstances clearly warrant the conclusion that the accumulation of earnings and profits was unreasonable"); *Thompson Engineering Co. v. Commissioner*, 751 F.2d 191, 197 (6th Cir.1985). As the Fifth Circuit in *Rutter Rex* held, the "[d]etermination of a corporation's reasonable business needs is properly left to the corporation's management since they are most familiar with the complexities and makeup of their corporation and its business." *Rutter Rex*, 853 F.2d at 1285

Furthermore, a Court should not question the business judgment of corporate management's business decision to finance its operations without incurring debt. As the Fifth Circuit in *Rutter Rex* stated:

> The laws do not force [a corporation] to turn to available commercial financing. The decision not to rely on credit is up to the business judgment of corporate management. The IRS and the courts have no power to substitute their judgment for the valid business judgment of corporate management to operate without extensive borrowing. This is true even though the corporation may have the ability to obtain favorable outside credit.

853 F.2d at 1285 (citations omitted); see also *Shaw–Walker Co. v. Commissioner*, 390 F.2d 205, 213 (6th Cir.1968)("The fact that a taxpayer has financed its growth from retained earnings rather than from the sale of additional stock or commercial borrowing 'should not place it in a position of being subjected to a penalty tax under Section 531' "); *Knight Furniture*, 81 T.C.M. (CCH) at 1076 ("Once an expenditure is deemed to be a reasonable need of the business, that a corporation chooses to finance the expenditure from earnings and profits rather than from debt should not place the corporation in a position of being subjected to the accumulated earnings tax").

In *Rutter Rex*, the Fifth Circuit concluded that Rutter Rex's "legally acceptable aversion to borrowing," coupled with the nature of its business, "demanded that [Rutter Rex] accumulate substantial capital in order to tide the company over during lean years." *Rutter Rex*, 853 F.2d at 1294. As a result, the Fifth Circuit determined that the accumulation of earnings

and profits to protect against certain potential future adverse business contingencies was a reasonably anticipated future need of the business within the meaning of 26 I.R.C. § 537. *Id.* at 1294.

As Treas. Reg. § 1.537–2(b) makes clear, the accumulation of earnings for "bona fide expansion of business or replacement of plant" is a reasonable business need. Therefore, capital accumulations are permissible for fleet replacement. See *W.L. Mead, Inc. v. Commissioner*, 34 T.C.M. (CCH) 924, 931 (1975)(long term accumulations justified pursuant to existence of periodic, but regular, plan of truck fleet replacement). Where a company has a history of growth and modernization, it need not always set aside a specific sum to achieve a specific goal. *John P. Scripps Newspapers v. Commissioner*, 44 T.C. 453, 457, 1965 WL 1175 (1965); *Salley,* 1976 WL 1157, at *11. Specific and definite plans may be evidenced by a history of expansion and a policy of continued growth. *Salley,* 1976 WL 1157 at *12 ("[T]he expansion history of the corporation should play an important role in determining whether it should be allowed to accumulate funds for expansion. A strong history of expansion is a positive indication that a corporation intends to continue expanding in the future); *Bremerton Sun Publishing Co. v. Commissioner,* 44 T.C. 566, 584, 1965 WL 1186 (1965).

The knowledge and experience of the taxpayer is given great deference by the Court, particularly with respect to the company's plans for expansion. In *C.E. Estes, Inc. v. Commissioner,* 41 T.C.M. (CCH) 354 (1980), the court relied on the taxpayer's statements as to its plans to expand its fleet of trucks in finding that the taxpayer was reasonable in accumulating earnings and profits:

> In 1974 the cost of a custom trailer was $8,000. Through his experience in the trucking industry Estes knew in 1974 that at least 20 of the trailers purchased in 1968 and 1969 would have to be replaced within the next few years at a cost of at least $160,000. It was also his experience that at about the same time two tractors would need replacement at a cost of at least $50,000. Thus, during fiscal 1974, petitioner was aware that within two to three years a cash outlay of at least $210,000 would be required. By 1975 custom trailer costs had risen to $10,000 per unit and tractors had increased to a price of $34,000 each. As a result, in fiscal 1975 petitioner revised its estimated cost to replace these items up to $268,000. Petitioner's plans to acquire this equipment were not vague or uncertain. They were believed to be necessary if petitioner was to remain in the business of hauling Celanese products and for the expansion of leasing operations.

> Estes' statements of petitioner's plans to purchase tractors and trailers are of particularly great weight since petitioner actually did expend $200,200 on new trailers in 1977, $96,000 on new tractors ordered in 1978, and $130,000 on more trailers in 1979.

> \* \* \* \* \* \*

> Based on the foregoing discussion, we hold that it was reasonable for petitioner to accumulate earnings for fiscal year 1974 in the amount of $210,000, and for 1975 in the amount of $268,000 for equipment needs.

*Id.* at 357–58, 1980 WL 4330.

As the Fifth Circuit has stated,

> With regard to plans for expansion, modernization, diversification, replacement of equipment, and similar business needs, the relevant inquiry is whether the company's plans appear to have been a real consideration during the tax year in question rather than simply an afterthought to justify the challenged

accumulations ... In order for such plans to be specific and definite, however, the taxpayer corporation need not have formal blueprints for action.

The test is whether the taxpayer intent to undertake the plan is manifested by some substantial active move toward implementation, such as incurring expenditures to further the plan.

*Rutter Rex*, 853 F.2d at 1292 (citations and quotations omitted).

The various projects considered by OCI and CTI during the years in question, those being part of the companies' core operations and plans for economic expansion, are subject to the same legal standards discussed above for fleet replacement. *See Rhoades Oil Company v. Commissioner*, 50 T.C.M. (CCH) 294, 307, 311–12 (1985). To the extent that plans to invest in each of the claimed projects were specific, definite and feasible, they constitute a reasonably anticipated need of the companies for which funds may be accumulated. Treas. Reg. § 1.537–1(b)(1); *see also, EMI Corporation*, 50 T.C.M. at 587–88 ("A corporation may reasonably accumulate earnings to fund an expansion of its business").

■ "Redemption of stock of a minority shareholder is a valid business purpose, and funds retained for such a purpose are retained for the reasonable needs of a corporation's business." *Oman Construction Co., Inc. v. Commissioner*, 24 T.C.M. (CCH) 1799, 1810 (1965); *EMI Corporation*, 50 T.C.M. (CCH) at 588. Funds may be reserved to meet future redemption obligations long in advance of the actual circumstances triggering the redemption where a company is bound to make future redemptions pursuant to a stock purchase agreement. *EMI Corporation*, 50 T.C.M. at 588–89.

■ A corporation may also reasonably accumulate earnings as a reserve against some contingent liabilities which would include potential legal liabilities. *Id.* at 586–87, 1985 WL 15007.

■ Finally, even if the above determinations show an excess so that accumulated earnings tax is due, the taxpayer is not liable for the tax if it shows "by the preponderance of the evidence that tax avoidance was not 'one' of the motives for retaining an 'excess' accumulation." *Salley*, 1976 WL 1157 at *7; 26 I.R.C. § 533(a). "It is not necessary that tax avoidance be the dominant, or sole motive." *Salley*, 1976 WL 1157 at *7 (citing *U.S. v. The Donruss Company*, 393 U.S. 297, 308, 89 S.Ct. 501, 507, 21 L.Ed.2d 495 (1969)). "[T]he taxpayer must show a complete lack of the proscribed motive." *EMI Corporation*, 50 T.C.M. at 583. 26 I.R.C. § 533(a) creates a presumption of tax avoidance motive if the corporation's accumulations are unreasonable. Such presumption is determinative "unless the corporation by the preponderance of the evidence shall prove to the contrary." 26 I.R.C. § 533(a); *Rutter Rex*, 853 F.2d at 1285 n. 13.

Considering the above criteria, the Court now turns to an application of the law to the facts of this case. As stated above, in order for plaintiffs to recover, they must prove that (1) the companies did not unreasonably accumulate earnings or (2) that if they did, the companies did not do so to avoid taxes with respect to their shareholders.[276] 26 I.R.C. § 533.

---

**276.** 26 U.S.C. § 533 provides:

Evidence of purpose to avoid income tax (a) Unreasonable accumulation determinative of purpose. For purposes of section 532, the fact that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect to shareholders, *unless the corporation by the preponderance of the evidence shall prove to the contrary.*

■ Applying the provisions of 26 I.R.C. §§ 531–537, as interpreted by the relevant Treasury Regulations, and case-law to the particular facts of this case, the Court finds that plaintiffs have met their burden of proving that they had reasonable business needs to accumulate the amounts identified by their experts for fleet replacement, project funding, working capital, potential legal liabilities, and shareholder redemption. Furthermore, the Court finds that the companies had specific, definite, and feasible plans for using the accumulations for those business needs. The Court heard the testimony of the Candies family members (i.e. the companies' management) and it finds that testimony to be credible. The Candies' testimony was corroborated in important respects by the testimony of disinterested third-party witnesses, by a considerable volume of documentary evidence, and even, in one important respect, by defendant's own expert, Captain Underhill, who acknowledged the companies' need to accumulate as much as $100,000,000 for fleet replacement.

The entire record is compelling in that it demonstrates the many valid business reasons which caused the companies to retain funds and the companies' specific, definite, and feasible plans to use the retained funds for those valid business needs. The actions of the companies, both during the years in question and thereafter, further illustrate the truthfulness of testimony regarding the intent of the companies' management. A thorough review of the evidence and testimony presented at trial clearly establishes that OCI and CTI were not "formed or availed of for the purpose of avoiding the income tax" with respect to their shareholders "by permitting earnings and profits to accumulate instead of being divided or distributed." 26 I.R.C. § 532(a). Rather, the companies' identi-

fied business needs provide more than ample justification for an accumulation of earnings and profits.

With respect to fleet replacement, the Court finds that the companies had reasonable business needs to accumulate, at a minimum, the amounts that Dr. Blaydon testified were required for fleet replacement in each of the years in question. Plaintiffs' needs for fleet replacement were certain as evidenced by Paul Candies' statements to IRS agent, Cyrus Fanguy, and as corroborated by the testimony of several witnesses, including that of shipyard representatives, Frank Terrell, Jr. and Sid Mizell. Management's plans to use the accumulations to meet those needs were specific, definite, and feasible. In fact, OCI's eventual net outlay of $50,000,000 and gross outlay of $173,000,000 for fleet replacement as well as CTI's recent $15,000,000 barge construction contract, confirms these plans, and indicate that Dr. Blaydon's estimates of the amounts required for fleet replacement were conservative.[277]

With respect to the projects, the overwhelming evidence presented by plaintiffs shows that the companies had a reasonable business need to accumulate funds for each of the projects identified in this opinion and that the companies' plans to use these funds for the projects were also specific, definite, and feasible. This conclusion is confirmed by plaintiffs' expert, Michael Odom, who independently determined (1) which projects were given serious and extensive consideration by the companies' management; and (2) the amounts that were required to complete those projects which were outstanding at the end of any of the fiscal years in question.

As for working capital, the Court finds that the companies reasonably intended to accumulate funds for this need. The

---

**277.** See Exhibit J–176 for table of construc- tion contracts.

Court accepts Dr. Blaydon's expert assessment of the amounts required by the companies for working capital for each of years in question.

Management's explanation for retaining assets to satisfy any potential legal liability to McDermott was credible. As previously mentioned, the lawsuit was fully settled after CTI made a $6,750,000 payment to McDermott.

Finally, the Court concludes that each of the companies had a reasonable business need to retain the amounts identified by Dr. Blaydon for stock redemption in accordance with the companies' stock redemption agreements. As previously noted, shareholder redemption plans, especially those involving minority shareholders, have been routinely recognized by the courts as legitimate business needs. See *Oman Construction Co., Inc.*, 24 T.C.M. (CCH) at 1810; *EMI Corporation*, 50 T.C.M. (CCH) at 588. Furthermore, having heard the testimony of the witnesses, the Court finds that management had specific, definite, and feasible plans to use the companies' accumulated funds for such shareholder redemption.[278]

In sum, the Court finds that plaintiffs' identified business needs were reasonable. In light of the strong caselaw mandating that courts defer to the business judgment of corporate management, the companies' conservative business approach, which has stood the test of time in a volatile industry, should not be second-guessed. As the Tax Court noted in *Rhoades Oil Company v. Commissioner*, 50 T.C.M.(CCH) 294, 306 (1985):

> Reasonable business needs cannot be determined in a vacuum or out of context of the given business or industry. In evaluating petitioner's reasonable business needs, we must keep in mind the nature of petitioner's particular business and the business environment in which it operated.

In *Rhoades Oil Company*, the Tax Court noted that the volatility of the oil and gas industry led to "rapidly accelerating prices for equipment, supplies, and personnel needed in the business of gas

---

**278.** Although defendant presented no direct evidence at trial contradicting plaintiffs' evidence of their need for shareholder redemption, defendant nevertheless claims in its post-trial memorandum that plaintiffs' accumulation of such funds is an indicator of an improper tax-avoidance motive because shareholder redemption plans only benefit the shareholders and not the corporation. In support of its contention, defendant relies upon *Pelton Steel Casting Co. v. Commissioner*, 251 F.2d 278 (7th Cir.1958) and *Firstco, Inc. v. United States*, 430 F.Supp. 1193, 1202 (S.D.Miss.1977). R. Doc. No. 82, p. 98–99. Those cases, however, are inapposite to the facts of this case. In both instances, each court found it significant that the redemption plans involved majority interests, rather than the minority interests involved in this case. In *Pelton*, the shareholding interests represented the controlling interest (80%) in the company. *Pelton*, 251 F.2d at 281. Similarly, in *Firstco*, the district court found the company to be a mere holding or investment company which carried with it the presumption of an intent to avoid income taxes. The taxpayer in that case was asserting a need to accumulate funds to redeem 100% of the company's stock. *Firstco*, 430 F.Supp. at 1199, 1202.

*Firstco* and *Pelton* are distinguishable in a material way from this case where the redemption need asserted by management is that of a minority, i.e., 33 percent, shareholder. See *EMI Corporation*, 50 T.C.M. at 588 (holding that although "a corporation may reasonably accumulate its earnings to fund a redemption of the shares of dissident or departing minority stockholders ... [w]hether the redemption of a majority stockholder's shares is a reasonable business need for the accumulation of the corporation's earnings and profits is a more difficult question"). The Court finds no evidence suggesting that the stock purchase agreements were designed to serve the personal interests of stockholders rather than the business interest of the corporation.

and oil exploration." *Id.* at 306, 1985 WL 14948. The Tax Court recognized that the specific environment in which the taxpayer operated had to be considered in evaluating Rhoades Oil Company's reasonable business needs with respect to a tar sand oil extraction project. Holding that the project constituted a reasonably anticipated business need for which the accumulation of funds was justified, the Court concluded by stating that, "[i]n an industry as volatile as the gas and oil business in those years, we would be loathe a decade later to second-guess corporate management as to its reasonable business needs for develop-

ing tar sands as an oil source." *Id.* at 311, 1985 WL 14948.

Given the extreme volatility of the companies' business both historically and during the years in question, the reasoning of the Tax Court in *Rhoades Oil Company* is particularly applicable here. This Court will not substitute its judgment for that of the companies' thoughtful and experienced management.

In summary, based upon the evidence presented at trial, the Court holds that plaintiffs' reasonable business needs for the years at issue were as follows:

| | | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 |
|---|---|---|---|---|---|---|---|
| OCI | Fleet Replacement | $39,800,000 | $42,900,000 | $48,400,000 | $49,000,000 | $57,400,000 | $37,200,000 |
| | Projects | 103,450,000 | 25,000,000 | 88,200,000 | 71,394,666 | 5,822,500 | 4,260,000 |
| | Working Capital | 4,000,000 | 4,500,000 | 5,200,000 | 7,200,000 | 7,000,000 | 7,100,000 |
| | Stock Redemption | 5,300,000 | 5,300,000 | 5,300,000 | 15,900,000 | 15,900,000 | 15,900,000 |
| | TOTAL | $152,550,000 | $77,700,000 | $147,100,000 | $143,494,666 | $86,122,500 | $64,460,000 |
| CTI | Fleet Replacement | $11,900,000 | $12,200,000 | $12,600,000 | $15,100,000 | $16,500,000 | |
| | Projects | 45,800,000 | 8,500,000 | 46,900,000 | 37,454,000 | 13,766,500 | |
| | Working Capital | 400,000 | 800,000 | 1,000,000 | 1,300,000 | 1,500,000 | |
| | Stock Redemption | 1,200,000 | 1,200,000 | 1,200,000 | 8,100,000 | 8,100,000 | |
| | TOTAL | $59,300,000 | $22,700,000 | $61,700,000 | $61,954,000 | $39,866,500 | |

Plaintiffs' reasonable business needs, including reasonably anticipated needs for the years at issue, compared to plaintiffs' accumulated earnings and profits as reflected in net liquid assets, produce the following results:

| | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 |
|---|---|---|---|---|---|---|
| OCI Available Assets | $41,100,000 | $40,400,000 | $42,900,000 | $41,500,000 | $32,300,000 | $34,600,000 |
| OCI Business Needs | 152,550,000 | 83,000,000 | 147,100,000 | 143,494,666 | 86,122,500 | 64,460,000 |
| Excess/(Deficit) | $(111,450,000) | (42,600,000) | (104,200,000) | (101,994,666) | (53,822,500) | (29,860,000) |
| | | | | | | |
| CTI Available Assets | $15,100,000 | $19,600,000 | $16,900,000 | $20,200,000 | $21,000,000 | |
| CTI Business Needs | 59,300,000 | 22,700,000 | 61,700,000 | 61,954,000 | 39,866,500 | |
| Excess/(Deficit) | $(44,200,000) | (3,100,000) | (44,800,000) | (41,754,000) | (18,866,500)[279] | |

Considering the foregoing, the Court finds that plaintiffs did not retain or accumulate their earnings beyond their reasonable business needs. To the contrary, as the foregoing chart indicates, plaintiffs' business needs actually exceeded their net liquid assets for each of the years in question. Under such circumstances, the accumulated earnings tax cannot apply. *Salley,* 1976 WL 1157 at *13.

▇ Inasmuch as the Court has determined that there was a deficit of accumulated earnings, it need not consider whether the companies were "availed of" by the shareholders for the purpose of avoiding income taxes to themselves. *Id.; Rhoades Oil Company,* 50 T.C.M. at 312–13, 1985 WL 14948. Nevertheless, the Court finds that a proscribed purpose was not present.

**279.** Exhibits P–919, P–920, P–921, P–922.

Defendant devoted the majority of its time at trial and in its post-trial brief to its claims of improper motive. Specifically, defendant argues that loans to shareholders, investment in entities unrelated to the companies' core business, and the use of company funds for personal benefits are factors indicative of improper motive.[280] These arguments, however, are not only irrelevant,[281] but also contrary to the evidence adduced at trial.

With respect to the shareholder loans, the testimony of witnesses established that from time to time OCI made loans to Kevin Candies and Paul Candies or Paul Candies, Inc. (a corporation owned by Paul Candies).[282] However, these loans were documented, secured with collateral, accrued interest, and were subject to repayment on demand.[283] The borrowers have made repayments on all of the loans and some have been completely repaid.[284] At no time did either of the companies make loans to the shareholders that were proportionate to their ownership interests, as would clearly have been the case if there had been an attempt to disguise dividends.[285] In fact, as the Candies family members testified, OCI made loans to shareholders rather than pay dividends be-cause the demand nature of the loans meant that the funds would always be available for OCI's business needs. Amounts distributed via dividends would have been unavailable to the companies.[286] Nothing about these loans suggests tax avoidance.

The travel and entertainment expenses underscored by the defendant throughout the trial are likewise immaterial and not determinative of the issue of an intent to avoid taxes. As the Candies family members testified, some of the expenses, a very small fraction of the total number of such items whose exact scope defendant could not identify,[287] were admittedly not properly documented as business or personal expenses.[288] Although OCI had a procedure for ensuring that shareholders or other employees were charged back for personal expenditures that were paid in the first instance by the company, the Court finds that a small number of such charges were inadvertently not so processed.[289] Defendant also claims that travel and entertainment expenses, including items admittedly properly documented and admittedly involving business matters such as client meetings, were extravagant and show that the Candies family members "took a lot of perks out of the business."[290] Defendant's

---

280. R. Doc. No. 76, Defendant's post-trial brief, pp. 2–3, 6, 21–24.

281. As previously stated, this Court need not even reach the question of whether plaintiffs were "availed of" for the purpose of avoiding taxes because this Court finds that the companies' reasonable business needs exceeded their available assets. *Rhoades Oil Company*, 50 T.C.M. at 312; 26 I.R.C. § 532(a).

282. R. Doc. No. 65, Stipulation, ¶¶ 168–89, 191–92; Testimony of Kevin Candies, pp. 389–93; Testimony of Paul Candies, pp. 294–95, 299–301, 304–06.

283. *Id.*

284. R. Doc. No. 88, Pretrial order, Uncontested facts, ¶¶ 7 .xv, .xvi, .xix.

285. Testimony of Otto Candies, Jr., p 136; Testimony of Paul Candies, pp. 293–94; Testimony of Kevin Candies, pp. 388–91.

286. Testimony of Otto Candies, Jr., p. 136–37; Testimony of Paul Candies, pp. 306–07, 393–95; Testimony of Kevin Candies, pp. 393–94.

287. R. Doc. No. 84, p. 171, 173.

288. Testimony of Otto Candies, Jr., pp. 166–67, 182–83; Testimony of Paul Candies, p. 312.

289. *Id.*

290. R. Doc. No. 76, Defendant's post-trial brief, pp. 21–23; R. Doc. No. 86, p. 622.

argument, however, is meritless. The evidence with respect to travel and entertainment expenses reveals the routine workings of a small business whose success is dependent in large part on its relationships with old and new customers and vendors. Accordingly, the Court does not attribute an improper motive with respect to these business expenditures.

Finally, the Court rejects defendant's arguments that the companies' investments in assets unrelated to the companies' business suggest an improper motive for retaining funds. According to the credible testimony of the Candies family members, to the extent that management made investments in unrelated business assets, they did so in order to increase their return on capital while diversifying risk. At all times, management intended to liquidate those investments when the funds reasonably could be used for business needs.[291]

Having considered the evidence of this case, the Court finds that the shareholders' honest intent was to expand the business of OCI and CTI and tax avoidance played no part in that decision. Accordingly, it is the determination of this Court that the accumulated earnings taxes assessed for the years in question against OCI in the total amount of $12,308,276[292] and against CTI in the total amount of $7,991,808[293] were wrongly assessed and collected and that these amounts, together with interest thereon at the applicable rate from the date of payment until refunded, should be paid the plaintiffs, Otto Candies, L.L.C. and Candies Towing Company, L.L.C. See *Salley*, 1976 WL 1157 at \*13. Judgment shall be entered in accordance with these findings of fact and conclusions of law.

\*　　\*　　\*　　\*　　\*　　\*

---

**291.** Testimony of Otto Candies, Jr., pp. 134–35; Testimony of Paul Candies, pp. 273–74; Testimony of Otto Candies, III, p. 431.

**292.** According to the stipulation of the parties, this amount is comprised of the following particulars:

**OCI**

| Fiscal Year | Tax | Penalty | Interest | Total |
| --- | --- | --- | --- | --- |
| 1991 | $1,407,768 | $281,554 | $ 541,458 | $ 2,230,780 |
| 1992 | 1,164,870 | 232,974 | 287,303 | 1,685,147 |
| 1993 | 1,422,827 | 284,565 | 208,278 | 1,915,670 |
| 1994 | 1,359,988 | 271,998 | 779,892 | 2,411,878 |
| 1995 | 1,889,607 | 377,921 | 792,905 | 3,060,433 |
| 1996 | 676,912 | 135,383 | 192,073 | 1,004,368 |
| TOTAL | $7,921,972 | $1,584,395 | $2,801,909 | $12,308,276 |

R. Doc. No. 88, Pretrial order, Uncontested facts, ¶ 7, ix.

**293.** This amount is comprised of the following particulars:

**CTI**

| Fiscal Year | Tax | Penalty | Interest | Total |
| --- | --- | --- | --- | --- |
| 1991 | $581,485 | $116,297 | $223,842 | $ 921,624 |
| 1992 | 971,621 | 194,324 | 240,230 | 1,406,175 |
| 1993 | 871,738 | 174,347 | 127,640 | 1,173,725 |
| 1994 | 1,569,390 | 313,878 | 898,930 | 2,782,198 |
| 1995 | 1,054,632 | 210,926 | 442,528 | 1,708,086 |
| TOTAL | $5,048,866 | $1,009,772 | $1,933,170 | $7,991,808 |

R. Doc. No. 88, Pretrial order, Uncontested facts, ¶ 7, ix.